KLESTADT & WINTERS, LLP
Tracy L. Klestadt
Joseph C. Corneau
570 Seventh Avenue, 17th Floor
New York, NY 10018
Tel. (212) 972-3000
Fax. (212) 972-2245

*Proposed Attorneys for the Debtors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| LIC CROWN MEZZ BORROWER LLC, et al. | : | Case No. 13-13304 (MG) |
|  | : |  |
|  | : | Joint Administration Pending |
| Debtors. | : |  |
|  | : |  |

### DECLARATION OF STEVEN A. CARLSON PURSUANT TO LOCAL BANKRUPTCY RULES 1007-2 AND 9077-1

Steven A. Carlson, pursuant to 28 U.S.C. § 1746, declares as follows:

1.       I am the Chief Restructuring Officer of each of LIC Crown Mezz Borrower LLC

("Mezz Borrower"), LIC Crown Fee Owner, LLC ("Fee Owner"), and LIC Crown Leasehold

Owner LLC ("Leasehold Owner," and together with Mezz Borrower and Fee Owner, the

"Debtors").  In accordance with the Local Bankruptcy Rules ("L.B.R.") 1007-2 and 9077-1 of the

United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"), I

submit this declaration ("Declaration") in connection with the above-captioned Chapter 11 cases

(the "Chapter 11 Cases").

1

23407752v.2

2.      I am generally familiar with the business and financial condition of the Debtors. In making any and all financial representations in this Declaration, I am relying on my own personal knowledge and on financial statements and other financial information as compiled, prepared and/or submitted to me by employees and agents of the Debtors.  Unless otherwise indicated, all financial information contained herein is presented on an estimated and unaudited basis.

3.      If I were called to testify, I would testify competently to the facts set forth in this Declaration and I am authorized to submit this Declaration on behalf of the Debtors.

**I.      Required Contents of Declaration**

A.      Nature of Debtors' Businesses

4.      Fee Owner is the owner of certain improved real property (the "Property") located at 47-44 31st Street, Block 282, Lot 1, Long Island City, County of Queens, New York, known as the "Factory Building." Fee Owner and Leasehold Owner are parties to an Amended and Restated Net Lease (the "Master Lease") pursuant to which Fee Owner leases the Property to Leasehold Owner. Leasehold Owner in turn leases portions of the Property to various commercial tenants (collectively, the "Tenants") pursuant to various leases (the "Leases"). As of the date hereof, there are approximately forty (40) Tenants occupying the Property pursuant to the Leases.

5.      The Property is managed by Newmark Knight Grubb Frank ("Newmark"), a property manager located at 125 Park Avenue, New York, New York 10017.

2

6.      Pursuant to their respective limited liability company agreements, each of the

Debtors' principal business office is 601 West 26th Street, Suite 1260, New York, New York

10001.

B.      <u>Organizational Structure and Governance.</u>

7.      Each of the Debtors is a limited liability company formed under the laws of the

state of Delaware.

8.      The sole member of each of Fee Owner and Leasehold Owner is Mezz Borrower,

holding one hundred percent (100%) of the ownership interests therein. The sole member of

Mezz Borrower is 30th Place Holdings LLC, a non-debtor, holding one hundred percent of the

ownership interests therein. An organizational chart depicting the organizational structure of the

Debtors is attached hereto as **<u>Exhibit 1</u>**.

9.      Fee Owner's affairs are governed by a certain Limited Liability Company

Agreement of LIC Crown Fee Owner LLC (the "<u>Fee Owner LLC Agreement</u>") dated as of May

22, 2006. Pursuant to the Fee Owner LLC Agreement, Mark Karasick is the President of Fee

Owner and Victor Gerstein is the Vice President of Fee Owner. William C. Diamond and

Richard B. Ford were each appointed as an Independent Manager (as defined by the Fee Owner

LLC Agreement) and Springing Member (as defined by the Fee Owner LLC Agreement).

10.     Leasehold Owner's affairs are governed by a certain Limited Liability Company

Agreement of LIC Crown Leasehold Owner LLC (the "<u>Leasehold Owner LLC Agreement</u>")

dated as of May 22, 2006. Pursuant to the Leasehold Owner LLC Agreement, Mark Karasick is

3

the President of Leasehold Owner. Ricardo Beausoleil and Alan Stachura were each appointed as an Independent Manager (as defined by the Leasehold Owner LLC Agreement) and Springing Member (as defined by the Leasehold Owner LLC Agreement).

11.     Mezz Borrower's affairs are governed by a certain Limited Liability Company Agreement of LIC Crown Mezz Borrower LLC (the "Mezz Borrower LLC Agreement") dated as of May 22, 2006. Pursuant to the Mezz Borrower LLC Agreement, Mark Karasick is the President of Mezz Borrower and Victor Gerstein is the Vice President of Mezz Borrower. Sandra Feldman and Edna Astacio were each appointed as an Independent Manager (as defined by the Mezz Borrower LLC Agreement) and Springing Member (as defined by the Mezz Borrower LLC Agreement).

12.     Pursuant to the PSA (defined below), I was appointed the Chief Restructuring Officer of each of the Debtors, effective as of October 2, 2013.

C.     Pre-petition Capital Structure

13.     Fee Owner and Leasehold Owner are parties to a certain Mortgage Spreader and Amended, Restated and Consolidated Fee and Leasehold Mortgage, Assignment of Leases and Rents and Security Agreement dated as of May 31, 2006 (the "Mortgage") in the original principal amount of $77,000,000 (the "Mortgage Loan").  Pursuant to the Mortgage Loan and other documents ancillary thereto (collectively, the "Mortgage Loan Documents"), Fee Owner and Leasehold Owner granted liens and security interests in substantially all of their properties to the original lender, CIBC Inc. The Mortgage Loan is currently held by U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association,

4

successor by merger to LaSalle Bank National Association for the registered holders of J.P.

Morgan Chase Commercial Mortgage Securities Trust 2006-CIBC15, Commercial Mortgage

Pass-Through Certificates, Series 2006-CIBC15 (the "Mortgage Lender"). Fee Owner and

Leasehold Owner are jointly and severally liable for the Mortgage Loan. The principal balance on

the Mortgage Loan as of the date hereof is approximately $71,476,375.69.

14.    Mezz Borrower is party to a certain Mezzanine Loan Agreement (the "Mezzanine

Loan Agreement"), dated as of May 31, 2006, with Petra Mortgage Capital Corp. LLC ("Petra")

in the original principal amount of $28,300,000. Pursuant to the Mezzanine Loan Agreement and

other documents ancillary thereto (collectively, the "Mezzanine Loan Documents"), Mezz

Borrower pledged to Petra 100% of its ownership interests in Fee Owner and Leasehold Owner.

The Mezzanine Loan is currently held by Factory Mezz LLC (the "Mezzanine Lender"), as

successor to Petra, and is serviced by Atlas Servicing ("Atlas"). The principal balance on the

Mezzanine Loan as of the date hereof is approximately $59,229,026.75.  The Mezzanine Loan is

guaranteed by Mark Karasick, the president of each of the Debtors, and 30th Place Holdings

LLC, the sole member of Mezz Borrower.

15.    Fee Owner has no secured or unsecured debt other than the Mortgage Loan. Mezz

Borrower has no secured or unsecured debt other than the Mezzanine Loan.

23407752v.2

16.     Leasehold Owner has unsecured indebtedness to various vendors, professionals and others in the aggregate amount of $1,243,796.49 (the "Unsecured Claims") and is also a borrower under the Mortgage Loan.[1]

D.     Purpose of Filing

17.     During the period from 2006 to 2008, the Factory Building was successful in leasing a significant portion of its vacant space.  The Factory Building undertook a series of necessary capital repairs and improvements in connection with these leases.  The 2008 recession had a devastating impact on many of the tenants that lease property in the Factory Building, resulting in many tenants vacating the Property.  The Factory Building's cash flow decreased substantially as a result of tenant departures and difficulty in attracting new tenants.  In the wake of the financial crisis, the Factory Building has barely generated sufficient revenues to pay debt service on the Mortgage Loan and operating expenses on a current basis, and there was insufficient income to pay interest on the Mezzanine Loan.

18.     Efforts to restructure the Mortgage Loan and the Mezzanine Loan were unsuccessful, and the Debtors defaulted on both the Mortgage Loan and the Mezzanine Loan when they matured in June 2013.

19.     Beginning in May 2013, the Debtors entered into negotiations with the Mortgage Lender and the Mezzanine Lender to determine the best course of action for all of the Debtors' stakeholders.  The parties determined that a prepackaged, voluntary chapter 11 bankruptcy filing

---

[1] This statement shall not constitute a concession as to the nature, validity or amount of any claim that is scheduled as contingent, unliquidated or disputed in any of the Debtors' Schedules of Assets and Liabilities or Statement of Financial Affairs.

23407752v.2

would result in the greatest recovery for the Debtors' general unsecured creditors and other stakeholders.

20.     On October 2, 2013, each of the Debtors, 30th Place Holdings LLC, Mark Karasick, the Mortgage Lender and the Mezzanine Lender entered into a Plan Support and Cooperation Agreement ("PSA").

21.     On the date hereof (the "Petition Date") each of the Debtors filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code") commencing the Chapter 11 Cases. The Debtors also filed the Debtors' Prepackaged Liquidating Chapter 11 Plan (the "Plan") and related Disclosure Statement ("Disclosure Statement") on the Petition Date.

22.     Pursuant to the Plan, the Property will be transferred (the "Transfer") pursuant to sections 363(b) and (f) and 1123(b) of the Bankruptcy Code, free and clear of all liens, claims, encumbrances and interests, but subject to all violations, ECB [New York City Environmental Control Board] liens, and exceptions to and defects in title as revealed in an accurate title report, to Mezzanine Lender or its designee (the "Transferee"), in consideration of (a) the payment in full and in cash of the Mortgage Loan, (b) the payment of all holders of allowed Unsecured Claims in full in cash, and (c) the payment to the equity holders of $5,000,000. The Transfer is to close immediately following confirmation of the Plan.

23.     Under the Plan, the Debtors' unsecured creditors will be paid in full, in cash, upon the effective date ("Effective Date") of the Plan (or as soon as practicable thereafter), including post-Petition Date interest pursuant to any applicable contract rate or, if there is no applicable

7

contract rate, the applicable federal rate, by the Debtors to the extent funds are available, with any remainder to be paid by the Transferee.

24.     All of the Leases at the Property will be assumed and assigned to Transferee on their current terms and conditions. All other executory contracts will be assumed and assigned to Transferee on their current terms and conditions.

25.     As described more fully in Article VI of the Plan, the Plan provides for mutual general releases by and between each of the Debtors, the Mortgage Lender and the Mezzanine Lender and others. The Plan further provides for the release of Mark Karasick and 30th Place Holdings LLC by the Mortgage Lender and the Mezzanine Lender.

26.     Pursuant to the Plan, (a) Class 1 Other Priority Claims, (b) Class 2 Mortgage Lender Claims, and (c) Class 4 General Unsecured Claims are not impaired, and accordingly, holders of claims in Class 1, Class 2 and Class 4 are not entitled to vote on the Plan, and are deemed to accept the Plan. Class 3 Mezzanine Lender Claims and Class 5 Equity Interests are impaired under the Plan and entitled to vote on the Plan. Votes of the holders of Class 3 Mezzanine Lender Claims and Class 5 Equity Interests were solicited prior to the Petition Date, and holders of such claims voted to accept the Plan.

27.     The Debtors believe that the pre-packaged, consensual liquidation under the Plan maximizes value for all of the Debtors' stakeholders, and is in the best interests of the Debtors, their creditors, and their estates.

E.     Debtors' Cases Not Originally Commenced Under Chapter 7

8

28.    The Chapter 11 Cases were not originally commenced under chapter 7 of the Bankruptcy Code.  Accordingly, L.B.R. 1007-2(a)(2) is not applicable.

F.    Pre-petition Creditors' Committee

29.    In accordance with L.B.R. 1007-2(a)(3), to the best of the Debtors' knowledge, no pre-petition creditors' committee has been formed.

G.    Holders of the Twenty Largest Unsecured Claims

30.    In accordance with L.B.R. 1007-2(a)(4), a consolidated list setting forth the Debtors' twenty (20) largest unsecured creditors excluding those persons who constitute "insiders" under Bankruptcy Code section 101(31) of the Debtors is attached as **Exhibit 2**.  As required by L.B.R. 1007-2(a)(4), Exhibit 2 includes the creditors' names, addresses, telephone numbers (for persons familiar with the account, if available), amount of each claim, and an indication of whether the claims are contingent, unliquidated, disputed, or partially secured.

H.    Holders of Five Largest Secured Claims

31.    In accordance with L.B.R. 1007-2(a)(5), a list of the Debtors' secured creditors is attached hereto as **Exhibit 3**.

I.    Summary of Assets and Liabilities

32.    As required by L.B.R. 1007-2(a)(6), a summary of the Debtors' assets and liabilities is attached as **Exhibit 4**.

J.    Debtors' Securities

33.    No interests in any of the Debtors are publicly held. Accordingly, L.B.R. 1007-2(a)(7) is not applicable.

9

23407752v.2

K.      Property in Possession or Custody of Custodian

34.     In accordance with L.B.R. 1007-2(a)(8), the Debtors have no property in

possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or

secured creditor, or agent for any such entity.

L.      Premises Where the Debtors Conduct Business

35.     In accordance with L.B.R. 1007-2(a)(9), the Debtors conduct their business at 601

West 26th Street, Suite 1260, New York, New York.

M.      Location of Debtors' Assets and Books and Records

36.     Pursuant to L.B.R. 1007-2(a)(10), the majority of the Debtors' books and records

are maintained at the 601 West 26th Street, Suite 1260, New York, New York 10001 and at

Newmark's offices, located at 125 Park Avenue, New York, New York 10017.  Substantially all

of the Debtors' physical assets are located at 47-44 31st Street, Block 282, Lot 1, Long Island

City, County of Queens, New York.

N.      Threatened or Pending Actions Against the Debtor

37.     Pursuant to L.B.R. 1007-2(a)(11), a list of pending or threatened actions is

annexed hereto as **Exhibit 5**.

O.      The Debtors' Senior Management

38.     Pursuant to L.B.R. 1007-2(a)(12), the Debtors' senior management consists of:

Steven A. Carlson (Chief Restructuring Officer): Mr. Carlson has over thirty years of
corporate management experience and has served as an officer, director, Chief Financial
Officer and Chief Restructuring Officer for numerous companies, including Texaco Inc,
and Changing World Technologies Inc.  In addition, Mr. Carlson has been involved in
several chapter 11 cases including, among others, Texaco Inc. and United Airlines Inc.
Most recently, he served as Chief Restructuring Officer of each of 205 East 45 LLC and

EALC LLC; Eastgate Tower Hotel Associates, L.P.; and 216 West 18 Owner LLC in their successful and efficient prosecution of chapter 11 cases and as a Director and Chief Restructuring Officer for TH Agriculture & Nutrition LLC (a wholly owned subsidary of Philips Electronics) during its successful administration of a chapter 11 case.  In all of these positions Mr. Carlson was the independent officer responsible for providing independent analysis and advice to the company during their chapter 11 cases. Mr. Carlson has a Bachelor of Arts degree (with Distinction) in Economics from Connecticut College and a Masters of Business Administration degree in Finance from New York University.

## II.    Additional Information Required by L.B.R. 1007-2(b)

39.    In accordance with L.B.R. 1007-2(b), pending confirmation of the Plan and the sale of the Property pursuant to the Plan, the Debtors intend to continue the operation of their respective businesses and the management of their respective properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

40.    In accordance with L.B.R. 1007-2(b)(1), the estimated amount of the weekly payroll to employees (exclusive of officers, directors, stockholders and partners) for the thirty (30) day period following the Petition Date is $68,000.00.

41.    In accordance with L.B.R. 1007-2(b)(2), the amounts paid and proposed to be paid for the thirty (30) day period following the Petition Date for services rendered by the Debtors' officers is approximately $15,000.00.

42.    The Debtors do not anticipate retaining a financial or business consultant, therefore L.B.R. 1007-2(b)(2)(C) is not applicable.

43.    In accordance with L.B.R. 1007-2(b)(3), a schedule of estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue but remain unpaid is annexed hereto as **Exhibit 6**.

23407752v.2

III.    **Information Related to "First-Day" Motions**

44.    On the Petition Date, the Debtors will file certain motions and applications for

relief that are required for the orderly transition of the Debtors into chapter 11.

A.    **Operational Motions**

(i)  *Pre-Petition Wage Motion*

45.    On the Petition Date, the Debtors will file their Motion for Entry of an Order

Authorizing Payment of Pre-petition Wages, Salaries and Employee Benefits and Other Related

Amounts (the "Pre-Petition Wage Motion").

46.    By the Pre-Petition Wage Motion, the Debtors seek authority to pay, in their

discretion, certain amounts to their employees that had accrued as of the Petition Date, but by

reason of the timing of the Petition Date, were not paid. These amounts include wages, salaries,

employee benefits and other related amounts.

47.    The Debtors submit that the Debtors' failure to pay these amounts could cause

serious hardship to their employees, and may result in the Debtors' employees seeking work

elsewhere. The Debtors do not want to take any risk that could affect the planned liquidation of

the Debtors in these Chapter 11 Cases. The Debtors submit, and I believe, granting the relief

requested by the Pre-Petition Wage Motion is necessary and beneficial to the Debtors and their

estates, and that the Pre-Petition Wage Motion should be granted.

(ii)  *Utilities Motion*

48.    On the Petition Date, the Debtors will file their Motion for an Order:

(i) prohibiting the Debtors' utility providers (defined below) from altering, refusing or

discontinuing Utility Services (defined below) on account of any pre-petition amounts owed and

outstanding for any Utility Services rendered, on account of the Debtors' bankruptcy filing or

because of any perceived inadequacy of the Debtors' proposed Adequate Assurance Deposit

(defined below); (ii) determining that the Utility Providers have received adequate assurance of

payment for future Utility Services, as provided herein; (iii) approving procedures whereby the

Utility Providers may request additional or different assurances beyond that proposed herein; and

(iv) determining that the Debtors are not required to provide any additional assurance beyond the

assurance set forth herein (the "Utilities Motion").

49.    By the Utilities Motion, and to ensure the continued provision of utility services

(the "Utility Services") to the Debtors, the Debtors seeks entry of an order prohibiting providers

of utility services (the "Utility Providers") from altering, refusing, or discontinuing services to, or

discriminating against the Debtors on account of pre-petition invoices, determining that Utility

Providers are adequately assured of future payment, and establishing procedures for determining

adequate assurance of payment.  Pursuant to the Utility Motion, the Debtors will provide Utility

Providers, to the extent that such Utility Providers do not currently have a security deposit, with a

cash deposit equal to two weeks' consumption based on the average of the prior fifty-two weeks,

which the Debtors submit satisfies section 366(c)(1)(A)(i) of the Bankruptcy Code. Additionally,

by the Utilities Motion, the Debtors have proposed procedures to address any request made by

the Utility Providers for additional adequate assurance, which procedures the Debtors believe

balances the requirements of section 366 of the Bankruptcy Code and the Debtors' need for

continuous, uninterrupted utility services.

13

23407752v.2

50.    Any disruption of Utility Services would cause irreparable harm to the Debtors'

business operations and the estates.  The Debtors have established a good payment history with

all of their Utility Providers.  To the best of the Debtors' knowledge, the Debtors have no

significant defaults or arrearages with respect to the Debtors' undisputed Utility Services

invoices.

51.    For the forgoing reasons, the Debtors submit, and I believe, that the relief

requested in the Utilities Motion is in the best interest of the Debtors, their estates and their

creditors, and therefore should be approved.

### (iii) Cash Collateral Motion

52.    On the Petition Date, the Debtors will file their Motion for Entry of Interim and

Final Orders (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection to

Secured Lenders, and (III) Scheduling a Final Hearing (the "Cash Collateral Motion").

53.    Certain of the Debtors' property constitute cash collateral (the "Cash Collateral")

within the meaning of section 363(a) of the Bankruptcy Code.

54.    Without immediate access to such Cash Collateral, the Debtors will be unable to

fund their day-to-day business operations during the pendency of the Chapter 11 Cases, which

would adversely affect the value of the Debtors' business.

55.    Through the Cash Collateral Motion, the Debtors respectfully request that the

Court (i) enter the proposed Interim Order Authorizing Use of Cash Collateral Pursuant to 11

U.S.C. § 363(c) and Granting of Adequate Protection Pursuant to 11 U.S.C. § 361 (the "Interim

Cash Collateral Order") authorizing the interim use of Cash Collateral on the terms and

14

conditions set forth in the Interim Cash Collateral Order, and scheduling a Final Hearing on the Motion; (ii) at the Final Hearing, enter an order (the "Final Cash Collateral Order" and, with the Interim Cash Collateral Order, the "Cash Collateral Orders") authorizing the continued use of Cash Collateral on the terms and conditions set forth in the proposed order to be filed by the Debtors with the Court; and (iii) grant such other and further relief as is just and proper.

56.    The Cash Collateral Orders have been negotiated with the Mortgage Lender and the Mezzanine Lender.  The Cash Collateral Orders provide, among other things, that the Debtors shall be entitled to use the Cash Collateral in accordance with and subject to the terms and conditions set forth therein. Generally, the proposed use of Cash Collateral shall be consistent with and for the purposes described in the budget attached to the Cash Collateral Orders as Exhibit A (the "Budget"), prepared by Newmark.  Key provisions of the Cash Collateral Orders are highlighted in the Cash Collateral Motion.

57.    Newmark formulated the Budget for the use of the Cash Collateral that includes estimated expenses of the Debtors for the 150-day period following the Petition Date. The Debtors believe that the Budget includes all reasonable, necessary and foreseeable expenses to be incurred in the ordinary course in connection with the operation of their business for the period set forth in the Budget. The Debtors also believe that the use of Cash Collateral in accordance with the Budget will provide the Debtors with sufficient liquidity to pay administrative expenses as they become due and payable during the period covered by the Budget.

58.    As adequate protection for any diminution in the value of the Pre-petition Collateral resulting from (i) the use of the Cash Collateral pursuant to Bankruptcy Code § 363(e),

23407752v.2

(ii) the use, sale or lease of the Pre-petition Collateral (other than the Cash Collateral) pursuant to section 363(c) of the Bankruptcy Code and (iii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, the Cash Collateral Orders provide that the Mortgage Lender and Mezzanine Lender shall be granted (upon Court approval and effective as of the Petition Date and without the necessity of the execution by the Debtors of any other security agreement or pledge agreement), pursuant to sections 361 and 363(e) of the Bankruptcy Code, to the same extent, priority, validity and perfection as the pre-petition liens (the "Pre-petition Liens") in Mortgage Lender's and Mezzanine Lender's respective Pre-petition collateral, as of the Petition Date, valid and perfected, replacement security interests in, and liens on in the Mortgage Lender's and Mezzanine Lender's respective collateral ("Replacement Liens"), but excluding causes of action under Chapter 5 of the Bankruptcy Code and the proceeds thereof on an interim basis (the "Post-Petition Collateral").

59.      In addition, to the extent the Replacement Liens are insufficient to adequately protect against the diminution of the Mortgage Lender's and Mezzanine Lender's interests in their respective Pre-petition Collateral, the Mortgage Lender and Mezzanine Lender shall each have an allowed administrative expense claim (the "Adequate Protection Claims"), with the priority in payment afforded by section 507(b) of the Bankruptcy Code, in an amount equal to the amount by which such diminution exceeds the value of the Replacement Liens. The Adequate Protection Claims shall have priority over all administrative expense claims and unsecured claims against the Debtors and their estates of any kind or nature whatsoever, whether now

16

existing or hereafter arising, but do not attach to the proceeds of causes of action under Chapter 5 of the Bankruptcy Code.

60.    Finally, the Debtors will pay the Mortgage Lender interest at the non-default rate due under the Mortgage Loan Documents through confirmation of the Plan.

61.    The use of the Cash Collateral is essential to the successful outcome of the Debtors' Chapter 11 Cases.  The Debtors must be able to provide comfort to its vendors, its employees, and others that it will be able to pay in the ordinary course for all post-petition purposes.  Authorization of the use of Cash Collateral will provide the Debtors with the liquidity necessary to operate their business and to pay the wages, salaries, rent, utilities and other expenses associated therewith.

**B.    Procedural Motions**

*(i)  Joint Administration Motion*

62.    On the Petition Date, the Debtors will file their Motion for an Order Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for Joint Administration of Cases (the "Joint Administration Motion").

63.    The administration of the Debtors' Chapter 11 Cases will be made more efficient if the Joint Administration Motion is granted, which would obviate the need for duplicative notices and mailings.

64.    Further, the Joint Administration Motion is for administrative purposes only. The rights of creditors against more than one of the Debtors are not prejudiced by the Joint Administration Motion.

23407752v.2

65.    Accordingly, I believe the Joint Administration Motion should be granted.

*(ii) K&W Retention Application*

66.    On the Petition Date, the Debtors will file their Application for an Order Authorizing the Employment and Retention of Klestadt & Winters, LLP as Attorneys for the Debtors and Debtors in Possession *Nunc Pro Tunc* to the Petition Date (the "K&W Retention Application").

67.    The Debtors believe that Klestadt & Winters, LLP is well qualified to provide the services contemplated by its retention application, and that the services to be provided by Klestadt & Winters, LLP are necessary for the Debtors' successful liquidation efforts.

68.    Accordingly, I believe the K&W Retention Application should be granted.

*(iii) Bar Date Motion*

69.    On the Petition Date, the Debtors will file their Application for an Order Establishing Last Date for the Filing of Proofs of Claim (the "Bar Date Motion").

70.    By the Bar Date Motion, the Debtors seek entry of an Order (the "Bar Date Order") pursuant to Bankruptcy Rule 3003(c)(3), establishing the last date (the "Bar Date") by which all entities (as defined in section 101(15) of the Bankruptcy Code) may file proofs of claims against the Debtors or their estates.

71.    Establishing a Bar Date is essential to success of the Debtors' Chapter 11 Cases and confirmation of the Plan. Entry of a Bar Date Order will enable the Debtors to know the universe of claims being asserted against them. Such information is necessary in order to proceed

18

with confirmation of the Plan immediately. Accordingly, I believe that the Bar Date Motion should be granted.

*(iv) Scheduling Motion*

72.     On the Petition Date, the Debtors will file their Scheduling Motion for Debtors' Prepackaged Chapter 11 Cases (the "Scheduling Motion").

73.     By the Scheduling Motion, the Debtors request that the Court set a combined hearing to consider confirmation of the Plan and approval of the Disclosure Statement, and setting an objection deadline for parties to object to the Disclosure Statement or confirmation of the Plan.

74.     The Scheduling Motion complies with the relevant provisions of General Order M-454 and I believe that an order granting the Scheduling Motion should be granted.

23407752v.2

IV.    **Conclusion**

75.    The Debtors believe that the protections afforded by chapter 11 will enable them

to maximize the value of the Debtors, their creditors and their estates.

Dated:  New York, New York
        October 10, 2013

                                    _/s/ Steven A. Carlson_____
                                    Steven A. Carlson
                                    Chief Restructuring Officer

**<u>Exhibit 1</u>**

23407752v.2

# OWNERSHIP STRUCTURE
## AFTER LEASEHOLD AND FEE ARE ACQUIRED



DS5713.DOC

**Exhibit 2**

23407752v.2

### Consolidated List of
### 20 Largest Unsecured Creditors

| Creditor Name and Address | Basis for Claim | Contingent, Unliquidated or Disputed (C,U,D) | Amount of Claim |
|---|---|---|---|
| Gerstein, Strauss & Rinaldi 57 West 38th Street, 9th Floor New York, NY 10018 | Legal Fees | | $11,515.00 |
| James Saunders 255 West 84th Street New York, NY 10024 | Alleged Brokerage Commission | C, U, D | $136,099.13 |
| NYCERS 335 Adams Street Brooklyn, NY 11201 | Balance of Landlord Work Contribution | | $283,399.10 |
| NYCERS 335 Adams Street Brooklyn, NY 11201 | Waterproofing | D | Unknown |
| NYCERS 335 Adams Street Brooklyn, NY 11201 | Damaged Duct | D | $66,000.00. |
| Schick Technologies, Inc. 47-44 31st Street Long Island City, NY 11101 | Remediation of water infiltration; installation of Class E System | C, U | $160,000 |
| SL Realty Services, LLC 601 West 26th Street Suite 1315 New York, NY 10001 | Leasing Commissions | | $586,783.26 |

23

**Exhibit 3**

23407752v.2

**Secured Creditors**

| Creditor | Principal Balance |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, SUCCESSOR IN INTEREST TO BANK OF AMERICA, NATIONAL ASSOCIATION, SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL ASSOCIATION FOR THE REGISTERED HOLDERS OF J.P. MORGAN CHASE COMMERCIAL MORTGAGE SECURITIES TRUST 2006-CIBC15, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-CIBC15 c/o C-III Asset Management LLC 5221 North O'Connor Boulevard, Suite 600 Irving, TX 75039 | $71,476,375.69 |
| Factory Mezz LLC c/o Atlas Servicing 505 Fifth Avenue, 28th Floor New York, NY 10017 | $59,229,026.75 |

25

**Exhibit 4**

23407752v.2

## 30th PLACE HOLDINGS LLC AND SUBSIDIARIES

### CONSOLIDATED BALANCE SHEET

### DECEMBER 31, 2012

### ASSETS

| | |
|---|---:|
| **Current assets** | |
| Cash and cash equivalents | $ 560,874 |
| Restricted cash | 900,587 |
| Tenant and other receivables, net | 301,237 |
| Escrows | 117,472 |
| Prepaid expenses | 851,088 |
| **Total current assets** | 2,731,258 |
| | |
| **Real estate** | |
| Land | 35,418,586 |
| Building and improvements | 72,857,812 |
| | 108,276,398 |
| Less: accumulated depreciation | (22,625,016) |
| **Real estate, net** | 85,651,382 |
| | |
| **Other assets** | |
| Reserves | 10,888 |
| Deferred financing costs, net of accumulated amortization of $2,781,142 | 318,637 |
| Deferred leasing costs, net of accumulated amortization of $1,794,341 | 2,459,255 |
| Deferred rent receivable | 6,061,844 |
| Utility deposits | 63,821 |
| **Total other assets** | 8,914,445 |
| | |
| **Total assets** | $ 97,297,085 |

## 30th PLACE HOLDINGS LLC AND SUBSIDIARIES

### CONSOLIDATED BALANCE SHEET

### DECEMBER 31, 2012

### LIABILITIES AND MEMBERS' DEFICIT

| | |
|---|---:|
| **Current liabilities** | |
| Accounts payable and accrued expenses | $ 1,697,384 |
| Current portion of mortgages payable | 877,467 |
| Deferred revenue | 108,394 |
| Prepaid rent | 82,920 |
| **Total current liabilities** | 2,766,165 |
| | |
| **Long-term debt** | |
| Mortgages payable, net of current portion | 121,618,901 |
| **Total long-term debt** | 121,618,901 |
| | |
| **Other liabilities** | |
| Tenants' security deposits payable | 409,921 |
| **Total other liabilities** | 409,921 |
| | |
| **Total liabilities** | 124,794,987 |
| | |
| **Commitments and contingencies** | |
| | |
| **Members' deficit** | (27,497,902) |
| | |
| **Total liabilities and members' deficit** | $ 97,297,085 |

## **Exhibit 5**

23407752v.2

**<u>Litigation</u>**

| Proceeding | Status |
|---|---|
| JAMES SAUNDERS v. CFG/AGSCB FACTORY, L.L.C., LIC CROWN LEASEHOLD OWNER LLC, LIC CROWN FEE OWNER LLC and 30TH PLACE HOLDINGS, LLC, Supreme Court, New York County, Index No. 106884/2011. | Pending |

28

**Exhibit 6**

**NEWMARK & COMPANY REAL ESTATE, INC.**
**SUMMARY OPERATING BUDGET:**
LIC CROWN LEASEHOLD OWNER, LLC

**POST BANKRUPTCY BUDGET**

|  | October 2014 |
|---|---|
| **PROJECTED REVENUES** | |
| Base Rent | 819,897 |
| Free Rent | 0 |
| Electric Inclusion | 0 |
| Electric Meter | 37,462 |
| Real Estate Escalation | 8,273 |
| Operating Escalations | 0 |
| Garage Income | 16,815 |
| Water/Sprinkler Income | 1,141 |
| Elevator Service Income | 2,000 |
| Roof/Satellite Income | 1,740 |
| Storage Rent | 0 |
| Interest Income | 50 |
| Collection Allowance - 4.0% | (35,493) |
| **TOTAL REVENUE** | **851,885** |
| | |
| **OPERATING EXPENSES** | |
| PAYROLL & FRINGES | 75,839 |
| CLEANING | 800 |
| ELECTRICITY & GAS | 96,953 |
| FUEL | 0 |
| WATER & SEWER | 0 |
| SANITATION & EXTERMINATION | 2,181 |
| SECURITY | 1,500 |
| MISCELLANEOUS OPERATING | 6,800 |
| **SUBTOTAL OPERATING** | 184,073 |
| | |
| **REPAIRS & MAINTENANCE** | |
| REPAIRS - EXCLUDING ELEVATOR | 22,150 |
| ELEVATOR REPAIRS | 7,900 |
| **TOTAL REPAIRS & MAINTENANCE** | 30,050 |
| | |
| **ADMINISTRATIVE EXPENSES** | |
| MANAGEMENT FEES - AGENT | 20,747 |
| MISC ADMINISTRATIVE EXPENSES | 66,887 |
| **TOTAL ADMINISTRATIVE** | 87,634 |
| **TOTAL OPERATING EXPENSES** | 301,757 |
| | |
| INSURANCE | 34,348 |
| REAL ESTATE TAXES | 111,246 |
| **TOTAL RE TAX & INS.** | 145,594 |
| | |
| **TOTAL EXPENSES** | 447,351 |
| **NET OPERATING INCOME** | **404,534** |