KLESTADT & WINTERS, LLP
Tracy L. Klestadt
Joseph C. Corneau
570 Seventh Avenue, 17th Floor
New York, NY 10018-6314
Telephone: (212) 972-3000
Facsimile: (212) 972-2245

*Proposed Attorneys for the Debtors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------- X
                                                    :    Chapter 11
In re:                                              :
                                                    :    Case No. 13-13304 (MG)
LIC CROWN MEZZ BORROWER LLC, et al.,                :
                                                    :    (Joint Administration Pending)
                          Debtors.                  :
                                                    :
-------------------------------------------------------------- X
```

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE USE OF CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION; (III) AUTHORIZING THE DEBTORS TO OBTAIN UNSECURED DEBT; (IV) MODIFYING THE AUTOMATIC STAY; AND (V) SCHEDULING A FINAL HEARING

LIC Crown Mezz Borrower LLC ("Mezz Borrower"), LIC Crown Leasehold Owner LLC

("Leasehold Owner") and LIC Crown Fee Owner LLC ("Fee Owner, and collectively with Mezz

Borrower and Leasehold Owner, the "Debtors"), as debtors and debtors in possession, hereby file

this motion (the "Motion") for entry of an interim order substantially in the form attached hereto

as Exhibit A (the "Interim Order"), pursuant to sections 105, 361, 362, 363, 364 and 507 of title

11 of the United States Code (the "Bankruptcy Code") and Rule 4001-2 of the Local Bankruptcy

Rules for the Southern District of New York (the "Local Bankruptcy Rules"), (i) authorizing the

Debtors' use of "cash collateral" (the "Cash Collateral") as such term is defined in section 363(a)

of the Bankruptcy Code; (ii) providing adequate protection to U.S. Bank National Association, as

Trustee, successor in interest to Bank of America, National Association, successor by merger to LaSalle Bank National Association for the registered holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2006-CIBC15, Commercial Mortgage Pass-Through Certificates, Series 2006-CIBC15 (the "Mortgage Lender") and Factory Mezz LLC (the "Mezzanine Lender," and with the Mortgage Lender, the "Lenders") for any diminution in value of their respective interests; (iii) authorizing the Debtors to obtain unsecured debt out of the ordinary course of business as an administrative expense for the funding of their operations during the pendency of these chapter 11 cases (the "Chapter 11 Cases"), to the extent necessary, that shall be allowable as an administrative claim under section 503(b)(1) of the Bankruptcy Code; (iv) vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order; and (v) scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and the entry of a Final Order (as defined herein) and approving the form of notice with respect to the Final Hearing.  The facts and circumstances supporting this Motion are set forth below and in the *Declaration of Steven A.  Carlson Pursuant to Local Bankruptcy Rule 1007-2 and 9077-1* (the "Carlson Declaration") filed concurrently herewith.  In further support of the Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code, Local Bankruptcy Rule 4001-2 and rule 4001(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**SUMMARY OF INFORMATION REQUIRED UNDER
BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2**

3.      The information required under Bankruptcy Rule 4001(b)(1)(B) with respect to the Debtors' proposed use of Cash Collateral is as follows:

(a)      Name of Entities with Interest in Cash Collateral.  The Debtors believe that the Lenders are the only parties that have a cognizable interest in the Cash Collateral.

(b)      Purposes for the Use of Cash Collateral.  The Debtors intend to use Cash Collateral for the general purpose of operating the improved real property located at 47-44 31st Street, Block 282, Lot 1, Long Island City, County of Queens, New York (the "Mortgaged Property") through confirmation of the proposed plan of liquidation filed contemporaneously with this Motion (the "Plan"), for the specific purposes set forth in the Budget attached to the Interim Order.

(c)      Material Terms.  The Debtors intend to use Cash Collateral only as set forth in the Budget attached to the Interim Order.  More specific terms relating to the use of Cash Collateral are set forth immediately below in connection with the information required under Local Rule 4001-2.

(d)      Adequate Protection. As adequate protection against any diminution in value of the Lenders' interest in the Prepetition Collateral, the Lenders shall be granted replacement liens on all of the right, title and interest of the Debtors in the Collateral, as well as superpriority adequate protection claim status, subject to the Carve-Out, as more fully set forth below.

4.      Pursuant to Local Rule 4001-2, the significant terms of the use of the Cash Collateral as provided in the proposed Interim Order attached hereto as Exhibit A are as follows[1]:

(a)      Amount of Cash Collateral.  As set forth in the Budget, which is attached as Exhibit A to the Interim Order and Exhibit B to this Motion).

(b)      Material Conditions to Closing and Borrowing.  Not applicable.

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Interim Order.

(c)     <u>Pricing and Economic Terms</u>.  Not applicable.

(d)     <u>Effect on Existing Liens</u>.

    i)      <u>Mortgage Lender</u>.  As adequate protection against any diminution in value of the Mortgage Lender's interest in the Mortgage Prepetition Collateral, the Mortgage Lender shall be granted Mortgage Lender Adequate Protection Liens on all of the right, title and interest of the Debtors in the Mortgage Collateral.  Subject to the Carve-Out, the Mortgage Lender Adequate Protection Liens shall be (i) first-priority perfected liens on all of the Mortgage Collateral that is not otherwise encumbered by validly perfected, non-avoidable security interests or liens as of the Petition Date, (ii) first-priority perfected liens on all of the Mortgage Collateral as to which the Mortgage Lender had a first priority lien as of the Petition Date, even if such Mortgage Collateral is subject to a validly perfected lien that is junior to the lien of the Mortgage Lien, and (iii) junior perfected liens on all Mortgage Collateral that is subject to a validly perfected lien with priority over the Mortgage Lender's liens as of the Petition Date.  As further adequate protection against any diminution in value of the interests of the Mortgage Lender in the Prepetition Collateral, the Mortgage Lender shall be granted a Mortgage Lender Adequate Protection Superpriority Claim, which claim shall be junior only to the Carve-Out. As additional adequate protection against any diminution in value of the interests of the Mortgage Lender in the Prepetition Mortgage Collateral, commencing with the first full calendar month following the Petition Date, the Mortgage Lender shall receive Adequate Protection Payments from the Debtors, payable monthly on the first (1st) day of each calendar month, in an amount equal to the interest at the non-default, contract rate that has accrued in connection with the Mortgage Loan as of the date of such Adequate Protection Payment. (Interim Order §§ 6, 8-10).  In addition, Mezzanine Lender has provided Mortgage Lender funds in the aggregate amount of $2,000,000.00 prior to the Petition Date as a protective advance under the Mezzanine Loan and the terms of the Intercreditor Agreement (defined below).

    ii)     <u>Mezzanine Lender</u>. As adequate protection against any diminution in value of the Mezzanine Lender's interest in the Mezzanine Collateral, the Mezzanine Lender shall be granted Adequate Protection Liens on all of the right, title and interest of the Debtors in the Mezzanine Collateral.  The Mezzanine Lender Adequate Protection Liens shall be subject to the Carve-Out and the Mortgage Lender's Adequate Protection Liens.  As further adequate protection against any diminution in value of the interests of the Mezzanine Lender in the Mezzanine Collateral, the

Mezzanine Lender shall be granted a Mezzanine Adequate Protection Superpriority Claim, which claim shall be junior only to the Carve-Out and the Mortgage Lender Adequate Protection Superpriority Claim. (Interim Order §§ 11-13).

(e)     <u>Carve-Outs</u>.  The proposed Interim Order contains a limited carve-out for Professional Fees, as defined therein. (Interim Order § 21).

(f)     <u>Cross-collateralization</u>.  Not applicable.

(g)     <u>Roll-up</u>. Not applicable.

(h)     <u>Limitation of Court's Power</u>.  Not applicable.

(i)     <u>Lender Limitations To Fund Certain Activities</u>.  The Cash Collateral may only be used in accordance with the Budget and, in any event, the Cash Collateral and the Carve-Out may not be used in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type against the Lenders or seeking relief that would impair the Lenders' rights and remedies under the Loan Documents, the Plan or the Interim Order. (Interim Order § 22).

(j)     <u>Termination/Default</u>.  The occurrence of any of the following events, unless waived by both the Lenders, shall constitute an event of default (collectively, the "<u>Events of Default</u>") (Interim Order § 17):

   i)      the failure by the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under the Interim Order;

   ii)     the Debtors' obtaining of credit or the incurring of indebtedness that is (i) secured by a security interest, mortgage or other lien on all or any portion of the Collateral which is equal or senior to any security interest, mortgage or other lien of the Lenders, or entitled to priority administrative status which is equal or senior to that granted to the Lenders;

   iii)    any lien or security interest purported to be created under the Loan Documents shall cease to be, or shall be asserted by Debtors not to be, a valid and perfected lien on or security interest in any Collateral, with the priority required by the Loan Documents or herein;

   iv)     the entry of an order by the Court granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor to execute upon or enforce a lien on or security interest in any Collateral having a value in excess of $100,000.00, or (ii) with respect to any lien on or the granting of

5

any lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a material adverse effect on the business, operations, property, assets, or condition, financial or otherwise, of the Debtors;

v)      reversal, vacatur, or modification (other than a modification with the express prior written consent of the Lenders) of the Interim Order;

vi)     dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases to chapter 7 cases, or appointment of a chapter 11 trustee or examiner with enlarged powers or other responsible person;

vii)    any misrepresentation of a material fact made after the Petition Date by the Debtors or their agents to the Lenders about the financial condition of the Debtors, the nature, extent, location or quality of any Collateral, or the disposition or use of any Collateral, including Cash Collateral;

viii)   a default by the Debtors in reporting financial information as and when required under this Interim Order;

ix)     the sale of any material portion of the Debtors' assets outside the ordinary course of business without the prior written consent of the Lenders, in their sole discretion;

x)      the failure to obtain entry of the Final Order by the Court within thirty (30) days following the Petition Date;

xi)     the failure to obtain the entry of a confirmation order for the  Plan by February 10, 2014, unless otherwise agreed to in writing by both the Lenders, or as contemplated specifically by the PSA (defined below);

xii)    the occurrence of any Plan Support Default, as defined in that certain Plan Support and Cooperation Agreement, dated October 2, 2013, between and among Mortgage Lender, Mezzanine Lender, Debtors, Mark Karasick and 30th Place Holdings LLC (the "PSA");

xiii)   the failure to comply with the Budget for any period, measured weekly as of the close of business on Wednesday of each following work week; or

xiv)    the filing by the Debtors of any motion seeking, or the granting of any motion providing for, reversal or modification of the Interim Order.

(k)     Change-of-control.  Not applicable.

(l)  <u>Deadline for Sale of Estate Property</u>.  The deadline to confirm the Plan is February 10, 2013, and the Plan provides for the transfer of the Mortgaged Property to a designee of the Mezzanine Lender.  (Interim Order § 19(k)).

(m)  <u>Prepayment Penalty</u>.  Not applicable.

(n)  <u>Joint Liability</u>.  Not applicable.

## BACKGROUND

5.  On the date hereof (the "<u>Petition Date</u>"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to operate their business and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.  As of the date hereof, the United States Trustee for the Southern District of New York (the "<u>U.S. Trustee</u>") has not appointed an official committee of unsecured creditors (a "<u>Creditors' Committee</u>") in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.  No trustee or examiner been appointed.  The Debtors are continuing in the management and operation of their business and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

**The Debtors**

7.     Fee Owner is the owner of the Property, known as the "Factory Building."  Fee Owner and Leasehold Owner are parties to an Amended and Restated Net Lease (the "Master Lease") pursuant to which Fee Owner leases the Property to Leasehold Owner.  Leasehold Owner in turn leases portions of the Property to various commercial tenants (collectively, the "Tenants") pursuant to various leases (the "Leases").  As of date hereof, there are approximately forty (40) Tenants occupying the Property pursuant to the Leases.

8.     The Property is managed by Newmark & Company Real Estate d/b/a Newmark Grubb Knight Frank (the "Manager").  Pursuant to their respective limited liability company agreements, each of the Debtors' principal business office is 601West 26th Street, Suite 1260, New York, New York 10001.

9.     Each of the Debtors is a limited liability company formed under the laws of the State of Delaware.  The sole member of each of Fee Owner and Leasehold Owner is Mezz Borrower, holding one hundred percent (100%) of the ownership interests therein. The sole member of Mezz Borrower is 30th Place Holdings LLC, a non-debtor, holding one hundred percent (100%) of the ownership interests therein.

**The Mortgage and Mezzanine Loans**

10.     Fee Owner and Leasehold Owner are parties to a certain Mortgage Spreader and Amended, Restated and Consolidated Fee and Leasehold Mortgage, Assignment of Leases and Rents and Security Agreement, dated as of May 31, 2006, in the original principal amount of $77,000,000.00 (the "Mortgage Loan").  Fee Owner and Leasehold Owner granted liens and security interests in substantially all of their properties to the original lender, CIBC Inc. The Mortgage Loan is currently held by the Mortgage Lender.  Fee Owner and Leasehold Owner are

jointly and severally liable for the Senior Mortgage. The principal balance on the Mortgage Loan as of October 10, 2013 is approximately $71,559,083.40.

11.    Mezz Borrower is party to a certain Mezzanine Loan Agreement, dated as of May 31, 2006, with Petra Mortgage Capital Corp. LLC ("Petra") in the original principal amount of $28,300,000 (the "Mezzanine Loan"), pursuant to which Mezz Borrower pledged to Petra one hundred percent (100%) of its ownership interests in Fee Owner and Leasehold Owner. The Mezzanine Loan is currently held by the Mezzanine Lender, as successor to Petra, and is serviced by Atlas Servicing. The principal balance on the Mezzanine Loan as of October 10, 2013 is approximately $57,022,400.72.

12.    Both the Mortgage Loan and the Mezzanine Loan are guaranteed by Mark Karasick, the president of each of the Debtors, and 30th Place Holdings LLC, the sole member of Mezz Borrower under certain circumstances pursuant to the applicable loan documents.

13.    In addition to the Mortgage Loan and the Mezzanine Loan, Leasehold Owner has unsecured indebtedness to various vendors, professionals and others in the aggregate amount of approximately $1,243,796.49.  Pursuant to the terms of the Plan, claims totaling $598,298.26 of this amount will be waived.

**The Circumstances Leading Up to the Case**

14.    During the period from 2006 to 2008, the Factory Building was successful in leasing a significant portion of its vacant space.  The Factory Building undertook a series of necessary capital repairs and improvements in connection with these leases.  The 2008 recession had a devastating impact on many of the tenants that lease property in the Factory Building, resulting in many tenants vacating the Property.  The Factory Building's cash flow decreased substantially as a result of tenant departures and difficulty in attracting new tenants.  In the wake

of the financial crisis, the Factory Building has barely generated sufficient revenues to pay debt service on the Mortgage Loan and operating expenses on a current basis, and there was insufficient income to pay interest on the Mezzanine Loan.

15.     Efforts to restructure the Mortgage Loan and the Mezzanine Loan were unsuccessful, and the Debtors defaulted on both the Mortgage Loan and the Mezzanine Loan when they matured in June 2013.

16.     Beginning in May 2013, the Debtors entered into negotiations with the Mortgage Lender and the Mezzanine Lender to determine the best course of action for all of the Debtors' stakeholders.  The parties determined that a prepackaged, voluntary chapter 11 bankruptcy filing would result in the greatest recovery for the Debtors' general unsecured creditors and other stakeholders.

17.     On October 2, 2013, each of the Debtors, 30th Place Holdings LLC, Mark Karasick, the Mortgage Lender and the Mezzanine Lender entered into the PSA in relation to the Plan.

18.     In connection with its decision to pursue the potential chapter 11 filing, the Debtors retained Steven A. Carlson as Chief Restructuring Officer of the Debtors to, among other things, direct and oversee the restructuring process.

**The Liquidating Chapter 11 Plan**

19.     The Debtors and their stakeholders negotiated the Plan that provides the Debtors and the Debtors' stakeholders with the opportunity to achieve an orderly transfer of the Property according to agreed-upon terms under the guidance of the Bankruptcy Court and provides a full distribution to the Debtors' other creditors who would otherwise receive nothing in a foreclosure or other liquidation.  The Plan provides for, *inter alia*, (i) the payment in full by the Mezzanine

Lender of the senior secured claim held by the Mortgage Lender, (ii) the sale of the Property pursuant to sections 363(b) and (f) and 1123(b) of the Bankruptcy Code, free and clear of all liens, claims, encumbrances and interests to the Mezzanine Lender's designee, (iii) the payment of all holders of allowed unsecured claims in full in cash, including applicable post-Petition Date interest, (iv) the payment by Mezzanine Lender to equity holders of $5,000,000.00; (v) the exchange of mutual releases and (vi) the assumption and assignment of all unexpired leases and executory contracts to Mezzanine Lender's designee.

20.    To the extent that the cash flow generated by the Mortgaged Property is insufficient to support the Debtors' operations during the pendency of these Chapter 11 Cases, the Plan stipulates that Mezzanine Lender shall cover the costs of any such operating shortfall. Further, to the extent that the Debtors' legal fees and expenses exceed the Prepetition Retainer (as defined below), any additional costs shall be borne by the Debtors' principals, subject to Bankruptcy Court review and approval of such costs.   The Plan contemplates that, subject to the confirmation of the Plan, the Mezzanine Lender and the Debtors' principals shall waive any administrative unsecured claims incurred as a result of providing such funding to the Debtors.

21.    Upon careful consideration of other alternatives, the Debtors determined that the filing of their Chapter 11 Cases and the Plan would be in the best interests of the Debtors' creditors and other stakeholders. The Debtors solicited votes on the Plan prior to the commencement of the Chapter 11 Cases and will file its proposed Plan and related disclosure statement concurrently herewith.

22.    For a more detailed description of the Debtors, their creditors and the circumstances leading up to these filings, the Debtors refer the Court and other interested parties to the Carlson Declaration and the Disclosure Statement.

## RELIEF REQUESTED

23.     By this Motion, the Debtors seek entry of an interim order substantially in the form attached hereto as <u>Exhibit A</u> (i) authorizing the Debtors' use of Cash Collateral; (ii) providing adequate protection to the Lenders for any diminution in value of their interests; (iii) authorizing the Debtors to obtain unsecured debt out of the ordinary course of business as an administrative expense for the funding of their operations during the pendency of these Chapter 11 Cases, to the extent necessary, that shall be allowable as an administrative claim under section 503(b)(1) of the Bankruptcy Code; (iv) vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order; and (iv) scheduling a Final Hearing to consider the relief requested in the Motion and the entry of a Final Order and approving the form of notice with respect to the Final Hearing.

24.     The Lenders consent to the use of Cash Collateral only on the terms set forth in the proposed form of Interim Order.  In order for the Debtors to operate the Mortgaged Property in the ordinary course of business and to preserve their bankruptcy estates, it is critical that the Debtors have immediate authorization to use Cash Collateral pursuant to the terms and conditions proposed herein.

## I.     DEBTORS' USE OF CASH COLLATERAL

### A.     *<u>The Debtors' Need for Use of Cash Collateral</u>*

25.     Pursuant to section 363(a) of the Bankruptcy Code, cash collateral is defined as, *inter alia*, deposit accounts, or other cash equivalents, whenever acquired, in which the estate and an entity other than the estate have an interest, and includes the proceeds, products, offspring, rents or profits of property subject to a security interest as provided in section 552(b)

of the Bankruptcy Code, whether existing before or after the commencement of a case under the bankruptcy code.

26.    All of the Debtors' cash generated from the Mortgaged Property, whether as original collateral or profits or proceeds of the Mortgaged Property or other Prepetition Collateral, will constitute cash collateral of the Mortgage Lender within the meaning of section 363(a) of the Bankruptcy Code.  Furthermore, pursuant to the terms of the Mezzanine Loan Documents, including that certain Cash Management Agreement dated May 31, 2006, Mezzanine Lender has a subordinate interest in the Cash Collateral.

27.    In addition to allowing the Debtors' business to continue on a normal basis, authorizing the use of Cash Collateral will enable the Debtors to (i) increase their available financial resources; (ii) engender confidence in their Tenants; and (iii) fund payments that will be required pursuant to other orders of this Court.  Moreover, authorizing the use of Cash Collateral will enable the Chapter 11 Cases to progress to confirmation of the Plan, which embodies a settlement that provides more benefit to the Debtors, their unsecured creditors, equity holders and all interested parties than would a foreclosure or other resolution.

### B.    *Terms and Conditions of the Debtors' Use of Cash Collateral*

28.    Under the proposed Interim Order, the Debtors would be authorized to use Cash Collateral for the period (the "Subject Period") from the Petition Date through the date which is the earlier to occur of (a) December 31, 2013, or (b) a Termination Declaration Date (as defined below), strictly pursuant to and in accordance with the Budget attached hereto as Exhibit B (the "Budget"), to satisfy (in the following order) (i) all payments to be made for insurance and taxes; and (ii) operational costs and expenses arising in connection with the administration of the Debtors' estates.  The Debtors may move amounts between line items on the Budget consistent with reasonable financial practice, but may not exceed any line items on the Budget by more

than 5% without the Lenders' permission. The Debtors may apply unused amounts for any line item on the Budget towards the payment of any other line item on the Budget. Upon the date of the expiration of the Subject Period (the "Expiration Date"), the Debtors' authority to use Cash Collateral shall cease absent further order of this Court.

29.    As adequate protection against any diminution in value of the Mortgage Lender's interest in the Mortgage Prepetition Collateral, the Mortgage Lender shall be granted the Mortgage Lender Adequate Protection Lines in the Mortgage Collateral provided, however, that the Mortgage Collateral shall not include Avoidance Actions or proceeds thereof. Subject to the Carve-Out, the Mortgage Lender Adequate Protection Liens shall be (i) first priority perfected liens on all of the Collateral that is not otherwise encumbered by validly perfected, non-avoidable security interests or liens as of the Petition Date, (ii) first priority perfected liens on all of the Collateral as to which the Mortgage Lender had a first priority lien as of the Petition Date, even if such Collateral is subject to a validly perfected lien that is junior to the lien of the Mortgage Lien, and (iii) junior perfected liens on all Collateral that is subject to a validly perfected lien with priority over the Mortgage Lender's liens as of the Petition Date.

30.    As further adequate protection against any diminution in value of the interests of the Mortgage Lender in the Mortgage Prepetition Collateral, the Mortgage Lender is hereby granted as and to the extent provided by, sections 503(b) and 507(b) of the Bankruptcy Code allowed superpriority administrative expenses claims in the Chapter 11 Cases and any Successor Case in the amount of the Mortgage Lender Adequate Protection Obligations (the "Mortgage Lender Adequate Protection Superpriority Claim").

31.    As additional adequate protection against any diminution in value of the interests of the Mortgage Lender in the Prepetition Mortgage Collateral, commencing with the first full

calendar month following the Petition Date, the Mortgage Lender shall receive adequate protection payments (the "Adequate Protection Payments") from the Debtors, payable monthly on the first (1st) day of each calendar month, in an amount equal to the interest at the non-default, contract rate that has accrued in connection with the Mortgage Loan as of the date of such Adequate Protection Payment.  The Adequate Protection Payments received by the Mortgage Lender pursuant to this Paragraph 10 shall be subject to claims pursuant to section 506 of the Bankruptcy Code with respect to recharacterization; provided, however, the Mortgage Lender reserves all rights to contest recharacterization.

32.     In addition, Mezzanine Lender has provided Mortgage Lender funds in the aggregate amount of $2,000,000.00 prior to the Petition Date as a protective advance under the Mezzanine Loan and the terms of that certain Intercreditor Agreement dated May 31, 2006 between CIBC Inc. and Petra (the "Intercreditor Agreement").

33.     As adequate protection against any diminution in value of the Mezzanine Lender's interest in the Mezzanine Prepetition Collateral, the Mezzanine Lender shall be granted Mezzanine Adequate Protection Liens on all of the right, title and interest of the Debtors in the Collateral.  The Mezzanine Lender Adequate Protection Liens shall be subject to the Carve-Out and the Mortgage Lender Adequate Protection Liens.  As further adequate protection against any diminution in value of the interests of the Mezzanine Lender in the Prepetition Collateral, the Mezzanine Lender shall be granted a Mezzanine Lender Adequate Protection Superpriority Claim, which claim shall be junior only to the Carve-Out and the Mortgage Lender Adequate Protection Superpriority Claim.

34.     Immediately upon the occurrence and during the continuation of an Event of Default, the Lenders may declare a termination, reduction or restriction of the ability of the

Debtors to use any Cash Collateral (any such declaration, a "<u>Termination Declaration</u>," and the earliest date any such Termination Declaration, the "<u>Termination Declaration Date</u>").  Upon the passage of five (5) days from the Termination Declaration Date, the Debtors' right to use Cash Collateral shall automatically cease, unless the Debtors shall have cured such Event of Default in full prior to the expiration of such five (5) day period, and the Debtors shall no longer have the right to use Cash Collateral.  During such five (5) day period, the Debtors and the Creditors' Committee, if any, shall have the right to seek a hearing solely for the purpose of seeking a determination of whether an Event of Default has occurred; upon the filing of a motion on shortened notice seeking such a determination on an expedited bases, the expiration of the five (5) day period shall be tolled pending the Court's decision on such motion. Upon the passage of seven (7) days from the Termination Declaration Date, the automatic stay shall automatically be terminated without further notice or order, and the Debtors shall no longer have the right to use Cash Collateral and the Lenders shall be permitted to exercise all remedies set forth herein in the Plan and in the Loan Documents, as applicable, and as otherwise available at law against the Collateral, without further order of or application or motion to the Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the liens and security interest in the Collateral or any other rights and remedies granted to the Lenders with respect thereto pursuant to the Loan Documents or this Interim Order, as applicable.

35.    Under the proposed Interim Order, the Adequate Protection Liens and the Adequate Protection Superpriority Claims will be subordinate only to the following (collectively, the "<u>Carve-Out</u>"): (i) fees pursuant to 28 U.S.C. § 1930(a)(6); (ii) fees payable to the clerk of the Bankruptcy Court and any agent thereof; (iii) pursuant to section 726(b) of the Bankruptcy Code,

reasonable fees and expenses of a trustee that are incurred after the conversion of the Chapter 11

Cases to cases under chapter 7 of the Bankruptcy Code, in an amount not to exceed $50,000; (iv)

professional fees and expenses incurred by professionals retained pursuant to Sections 327(a)

and 1103 of the Bankruptcy Code by the Debtors and the Creditors' Committee (if such

committee should be appointed); and (v) the $75,000.00 amount (the "Prepetition Retainer")

provided by Mezzanine Lender prior to the Petition Date for the payment of Debtors' legal fees

and expenses (collectively, the "Professional Fees").   Payment of any obligations within the

Carve-Out will not reduce the Mortgage Loan or the Adequate Protection Obligations and will

not subordinate the Adequate Protection Liens or the Adequate Protection Superpriority Claims

to any junior prepetition or postpetition lien, interest, or claim in favor of any other party.

However, nothing in the Interim Order will alter the requirements for Court approval and

allowance of Professional Fees or the rights of the Debtors, the Lenders or any other party-in-

interest to object to the award of Professional Fees in accordance with any applicable Bankruptcy

Rule or, if applicable, order of the Court relating to the approval of Professional Fees and

objections thereto.

36.     The proposed Interim Order contains a number of other conditions, limitations

and requirements, and the summary of certain provisions herein is not intended to substitute for,

or modify in any way, the language of the proposed Interim Order itself.

37.     Finally, in order to effectuate all of the terms and provisions of the Interim Order,

including, without limitation, to: (a) permit the Debtors to grant the Adequate Protection Liens

and Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as the

Lenders may request in its sole discretion to assure the perfection and priority of the liens

granted herein; and (c) authorize the Debtors to pay, and the Lenders to retain and apply,

payments made in accordance with the terms of the Interim Order, the Debtors request that the Court modifies the automatic stay under Bankruptcy Code section 362(a), as necessary.

### D.    *Bank Accounts*

38.    Under the guidance of the CRO, the Debtors will establish two (2) "debtor in possession" bank accounts (collectively, the "New Bank Accounts") with Capital One (the "Bank"), which the Debtor understands is a financial institution insured by the Federal Deposit Insurance Corporation (the "FDIC").  These bank accounts include an operating account and a payroll account.  The Debtors will manage their cash receipts, transfers and disbursements and record such collections, transfers and disbursements through the New Bank Accounts, as well as through the continuance of the lock box currently in place (the "Lock Box").  The Debtors will (i) deposit funds in and withdraw funds from the New Bank Accounts and the Lock Box by all usual means, including, without limitation, checks, wire transfers and other debits; and (ii) pay any ordinary course bank fees incurred after the Petition Date in connection with the New Bank Accounts and the Lock Box.

39.    The Debtors will manage their cash receipts, transfers and disbursements and record such collections, transfers and disbursements through the New Bank Accounts.  The New Bank Accounts cannot be used until the Petition Date, and all postpetition transfers and transactions will be properly documented in their books and records.  The Debtors will utilize a number of methods for disbursing funds from the New Bank Accounts, including: (i) debit; (ii) wire transfer; and (iii) written check.

40.    The Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") has established certain operating guidelines for debtors in possession to supervise the administration of chapter 11 cases entitled, "Operating Guidelines and Reporting

Requirements For Debtors in Possession and Trustees" (the "<u>Guidelines</u>").  Prior to the filing of these Cases, the Debtors provided the U.S. Trustee's office with a copy of this Motion and the proposed interim and final orders.  The Debtors believe they have complied with these Guidelines.

### C.    *Basis for Relief Requested*

41.    The Debtors' use of Cash Collateral is appropriate and should be authorized under section 363(c)(2) of the Bankruptcy Code, which provides that debtors may use, sell or lease cash collateral if "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  In order to use cash collateral in accordance with section 363(c)(2)(B) of the Bankruptcy Code in situations where the collateral holders do not consent, debtors are required to provide each party that holds an interest in the cash collateral, to the extent applicable, with "adequate protection" for such use as contemplated by section 361 of the Bankruptcy Code. *See* 11 U.S.C. § 363(e).

42.    Section 363(e) of the Bankruptcy Code provides that, upon request of an entity that has an interest in cash collateral sought to be used by a debtor, the court shall prohibit or condition such use of cash collateral as is necessary to provide adequate protection of such entity's interest. *Id.*

43.    Courts determine the means for providing adequate protection on a case by-case basis.  *See In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725 (Bankr. S.D.N.Y. 1986); *see also MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1397 (10th Cir. 1987); *In re Martin v. United States (In re Martin)*, 761 F.2d 472 (8th Cir. 1985).  Adequate protection is provided to protect a secured creditor from any diminution in the value of its

interest in the particular collateral during the period of use. *See In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *Beker Indus. Corp.*, 58 B.R. at 736; *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).

44.    Adequate protection is meant to ensure that the secured lender receives the value for which it originally bargained. *See In re Mosello*, 195 B.R. at 288 ("[t]he purpose of 'adequate protection' for a creditor 'is to insure that the creditor receives the value for which he bargained prebankruptcy'") (*citing Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994). Courts have noted that "[t]he essence of adequate protection is the assurance of the maintenance and continued recoverability of the lien value during the interim between the filing … and the confirmation." *In re Arriens*, 25 B.R. 79, 81 (Bankr. D. Or. 1982); *In re O.P. Held, Inc.*, 74 B.R. 777, 782 (Bankr. N.D.N.Y. 1987). The focus of the requirement is to protect a secured creditor from diminution in value during the use period. *See 495 Cent. Park Ave. Corp.*, 136 B.R. at 631; *Beker Indus. Corp.*, 58 B.R. at 736; *In re Ledgemere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass. 1990); *In re Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988).

45.    In addition to the Adequate Protection Liens, the Interim Order grants the Lenders Adequate Protection Superpriority Claims. These liens and claims provide the Lenders with adequate protection under the circumstances, and the Lenders consent to the use of Cash Collateral, but only on the terms set forth in the Interim Order.

46.    The continued operation of the Debtors' business through use of the Cash Collateral will preserve their value and ultimately enable the Debtors to confirm their proposed Plan. Conversely, if the Debtors are not authorized to use Cash Collateral, the Debtors likely will not be able to continue operating the Mortgaged Property, the Plan will not be confirmed,

and the Mortgaged Property will deteriorate in value. Further, the settlements reflected in the Plan will not be effectuated and the Mortgaged Lender will seek to take the property via foreclosure or deed in lieu, leaving unsecured creditors without a recovery.

47.     It is well established that a bankruptcy court, where possible, should resolve issues in favor of preserving the debtor as a going concern. Without the availability of cash to meet daily operating expenses, the congressional policy favoring rehabilitation over economic failure would be frustrated. *Chrysler Credit Corp. v. Ruggiere (In re George Ruggiere Chrysler-Plymouth, Inc.)*, 727 F.2d 1017, 1019 (11th Cir. 1984); *see also Northwest Airlines Corp. v. Ass'n of Flight Attendants- CWA (In re Northwest Airlines Corp.)*, 349 B.R. 338, 380 (S.D.N.Y. 2006) ("[t]he Bankruptcy Code embodies a strong policy in favor of reorganization"), affd., 483 F.3d 160 (2d Cir. 2007).

48.     Accordingly, courts authorize the use of cash collateral to enhance or preserve the debtor's going concern value. For example, in *Stein v. United States Farmers Home Admin. (In re Stein)*, 19 B.R. 458 (Bankr. E.D. Pa. 1982), the court allowed a debtor to use cash collateral where the secured party was undersecured, finding that the use of cash collateral was necessary to the debtor's continued operations, and that the creditor's "secured position can only be enhanced by the continued operation of the [debtor's business]." *Id*. at 460; *see also In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (debtor's reinvestment of rents to maintain and operate office building "will serve to preserve or enhance the value of the building which, in turn, will protect the collateral covered by [the] mortgage"); *Hartigan v. Pine Lake Vill. Apartment Co. (In re Pine Lake Vill. Apartment Co.)*, 16 B.R. 750, 756 (Bankr. S.D.N.Y. 1982) ("[t]he protection and maintenance of the plaintiff-mortgagee's collateral . . . clearly ensures that the plaintiff-mortgagee's investment is adequately protected"); *Fed. Nat'l.*

*Mortg. Ass'n v. Dacon Bolingbrook Assocs., Ltd. P'ship.*, 153 B.R. 204, 214 (N.D. Ill. 1993) (security interest protected to extent debtor reinvested rents in operation and maintenance of the property); *In re Dynaco Corp.*, 162 B.R. 389, 395–96 (Bankr. D.N.H. 1993) (finding that the alternative to the debtor's use of cash collateral, termination of its business, would doom reorganization and any chance to maximize value for all creditors); *In re Karl A. Neise, Inc.*, 16 B.R. 602 (Bankr. S.D. Fla. 1981) (marginally secured creditor adequately protected by lien on postpetition property acquired by debtor; debtors can use cash collateral in the normal operation of their business).

49.     The Debtors believe that use of Cash Collateral pursuant to the terms and conditions set forth above is fair and reasonable and adequately protects the Lenders.  The combination of (a) the Debtors' ability to preserve the going concern value of the business with the use of Cash Collateral, (b) the Adequate Protection Liens, (c) providing the Lenders with the other protections set forth herein and in the Interim Order, and (d) granting administrative priority under Section 507(b) of the Bankruptcy Code, adequately protects the Lenders' secured position under section 361(2) and (3).  For all of the reasons stated above, and because the primary parties with interests in the Debtors' use of the Cash Collateral (the Lenders) consent to the Debtors' use of Cash Collateral on the terms set forth in the Interim Order, approval of the Interim Order is appropriate.

### D.    *Interim Approval Of the Use of Cash Collateral Should be Granted*

50.     Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of a motion requesting such use.  Accordingly, the Debtors are first requesting entry of an Interim Order providing for interim use of Cash Collateral pending the Final Hearing on this Motion.

51.    As noted above, the Lenders consent to the Interim Order attached hereto as Exhibit A.  Therefore, the Court may enter the order under Section 363(c)(2) since "each entity that has an interest in such collateral consents."  Moreover, with respect to interim authorization to use Cash Collateral, the Debtors' need to use such Cash Collateral is immediate and compelling.  Without such authorization, the Debtors may not be able to continue their operations on a normal basis, which would cause it to suffer severe immediate and irreparable harm.  If the Debtors shut down, the effect on the value of the Mortgaged Property could be disastrous.  Moreover, the Plan could not be consummated and the Chapter 11 Cases could not be maintained.  According, the Debtors have determined that the terms and conditions of the Interim Order are fair and reasonable under the circumstances and reflect the Debtors' exercise of reasonable business judgment consistent with the Debtors' fiduciary duties as debtors in possession.

52.    Because the use of Cash Collateral by the Debtors is necessary to prevent the irreparable harm that would befall the Debtors, their estates and their creditors if the Debtors' business had to cease operations, and with the Lenders having consented to the use of Cash Collateral as provided herein, the Court should authorize the Debtors' use of Cash Collateral and enter the Interim Order in the form attached hereto as Exhibit A, and the Final Order as submitted prior to the Final Hearing.  Similar relief has been granted in other chapter 11 cases. *See, e.g.*, *In re Dana Corp*, Case No. 06-10354 (BRL) (Banrk. S.D.N.Y. Mar. 3, 2006) [Docket No. 721], *In re ATA Holdings Corp.*, Case No. 04-19866 (BHL) (Bankr. S.D. Ind. Oct. 26, 2004) [Docket No. 718]; *In re Allegiance Telecom, Inc.*, Case No. 03-13057 (RDD) (Bankr. S.D.N.Y. May 14, 2003) [Docket No. 33]; *In re Adelphia Commc'ns. Corp.*, Case No. 02-41729 (REG)

(Bankr. S.D.N.Y. June 25, 2002) [Docket No. 11704], *In re Enron Corp.*, Case No. 01-16034

(AJG) (Bankr. S.D.N.Y. Dec. 12, 2001) [Docket No. 5744].

53.     At the final hearing on this Motion, the Debtors will ask the Court to enter a final

order (the "Final Order") that adequately protects the interests of the Lenders in the Cash

Collateral.

### E.     *Administration of Cash Collateral and Bank Accounts.*

54.     The continued employment of the CRO of the Debtors is an integral component

of the overall restructuring and the use of Cash Collateral under the Interim Order as approved

by the Lenders.  The Interim Order provides that the CRO will perform services with respect to

the Mortgaged Property in a similar manner as the Debtors did prepetition, to the extent and as

directed by the CRO in accordance with its Employment Agreement.  The Debtors intend to

establish and use their bank accounts in a manner similar to those used prior to the Petition Date

for the operation of the Mortgaged Property.

55.     The Interim Order provides for the CRO to engage the Manager to manage the

Mortgaged Property, including the collection of rent from tenants of the Mortgaged Property,

consistent with prepetition practices.  In connection therewith, the Manager will continue to

submit a "Request for Approval of Invoices" to the CRO, detailing all ordinary course payments

for which it seeks approval, and, upon the written approval of the CRO, the Manager will remit

payments of these ordinary course expenditures from an operating account established by the

Debtors.  The Manager will be prohibited from making any payments that are (a) not in the

ordinary course of business, (b) not approved by the CRO, and/or (c) inconsistent with the

Budget absent prior approval from both the CRO.

56.     In terms of reporting, the Interim Order provides that the Debtors will deliver to

the Lenders on or before the close of business of the fifteenth day of each month (and if such day

is not a business day, then the next succeeding business day) a (i) comparison for the prior month of actual results of all items contained in the Budget to the amounts originally contained in the Budget and (ii) cumulative comparison for the period from the Petition Date through the end of the prior month of the actual results of all items contained in the Budget to the amounts originally contained in the Budget, in each case along with such supporting information and additional reporting as the Lenders may request.

## II.    DEBTORS' NEED FOR UNSECURED POSTPETITION DEBT

57.    The Debtors believe that the Mortgaged Property will generate sufficient capital to operate the Debtors' business and fund the costs of the Chapter 11 Cases.  However, in the event that the Debtors the Cash Collateral is insufficient to maintain the Debtors' operations, the Debtors hereby respectfully request Court approval pursuant to section 364(b) of the Bankruptcy Code to incur unsecured debt out of the ordinary course of business that will be subject to administrative priority status pursuant to section 503(b)(1) of the Bankruptcy Code.

58.    As described above, to the extent that the Mortgaged Property fails to generate sufficient operating capital, Mezzanine Lender shall provide the Debtors with additional funding on an unsecured basis.  Such credit shall be entitled to administrative status pursuant to sections 364(b) and 503(b)(1) of the Bankruptcy Code.  Mezzanine Lender shall waive this unsecured claim upon confirmation of the Plan.

59.    Prior to the Petition Date, Mezzanine Lender provided the Debtors with the Prepetition Retainer for the purposes of funding the legal costs of the Debtors' Chapter 11 Cases. To the extent that the Prepetition Retainer is insufficient to cover the Debtors' legal fees and expenses, Debtors' principals shall provide additional funding.  This funding shall be entitled to administrative status pursuant to sections 364(b) and 503(b)(1) of the Bankruptcy Code. Debtors' principals shall waive this unsecured claim upon confirmation of the Plan.

## III.     THE FINAL HEARING AND CONTINUED USE OF CASH COLLATERAL

60.     The Debtors respectfully request that the Court schedule the Final Hearing on a date no later than November 12, 2013.  At least three (3) days prior to the Final Hearing, the Debtors will provide to the Court and other specified parties-in-interest a proposed Final Order. The Debtors expect that the Final Order will be presented with the consent of the Lenders, similar to the Interim Order.

61.     At the Final Hearing, the Debtors intend to request that the Court grant the continued use of Cash Collateral through the earlier of the effective date of its proposed Plan or April 10, 2013.

62.     The Final Hearing Notice will provide that any party-in-interest objecting to the relief requested in the Motion on a final basis shall file written objections with the Clerk of the Court no later than seven (7) days prior to the Final Hearing, which objections shall be served so as to be received on or before such date by: (i) proposed counsel to the Debtors, Klestadt & Winters, LLP, 570 Seventh Avenue, 17th Floor, New York, New York 10018-6314, Attn:  Tracy L. Klestadt and Joseph C. Corneau; (ii) counsel to the Mortgage Lender, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York New York 10153, Attn:  Alfredo Perez; (iii) counsel to the Mezzanine Lender, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., 666 Third Avenue, New York, New York 10017, Attn:  John H. Bae and Kaitlin R. Walsh; (iii) counsel to any Creditors' Committee; and (iv) the Office of the U.S. Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014, Attn: Paul Schwartzberg.

## NOTICE

63.     Notice of this Motion has been given to (i) counsel to Mortgage Lender; (ii) counsel to Mezzanine Lender; (iii) the US Trustee; and (vi) all other known parties-in-interest,

including creditors holding unsecured claims against the Debtors' estates.  In light of the nature of the relief requested, the Debtors submit that no further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter an interim order in substantially the form attached hereto as <u>Exhibit A</u> (i) authorizing the Debtors' use of the Cash Collateral, (ii) granting adequate protection to the Lenders for any diminution in value of their interests, (iii) authorizing the incurrence of unsecured debt out of the ordinary course of business; (iv) modifying the automatic stay, (v) scheduling a final hearing, and (vi) granting such other and further relief as the Court may deem just and proper.

Dated:  October 10, 2013
   New York, New York

         KELSTADT & WINTERS, LLP

         */s/ Tracy L. Klestadt*
         Tracy L. Klestadt
         Joseph C. Corneau
         570 Seventh Avenue, 17th Floor
         New York, New York 10018-6314
         Telephone: (212) 972-3000
         Facsimile:  (212) 972-2245

         *Proposed Attorneys for the Debtors*

**Exhibit A**

**(Proposed Interim Order)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------- X
                                                              :    Chapter 11
In re:                                                        :
                                                              :    Case No. 13-13304 (MG)
LIC CROWN MEZZ BORROWER LLC, et al.,                          :
                                                              :    (Joint Administration Pending)
                    Debtors.                                  :
                                                              :
------------------------------------------------------------- X
```

### INTERIM ORDER (I) AUTHORIZING THE USE OF CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION; (III) AUTHORIZING THE DEBTORS TO OBTAIN UNSECURED DEBT; (IV) MODIFYING THE AUTOMATIC STAY; AND (V) SCHEDULING A FINAL HEARING

Upon the Motion, dated October 10, 2013 (the "Motion") of LIC Crown Mezz Borrower LLC ("Mezz Borrower"), LIC Crown Leasehold Owner LLC ("Leasehold Owner") and LIC Crown Fee Owner LLC ("Fee Owner, and collectively with Mezz Borrower and Leasehold Owner, the "Debtors"), for an order pursuant to sections 105, 361, 362, 363, 364 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), seeking entry of an interim order (this "Interim Order") providing the following relief: (i) authorizing the Debtors' use of "cash collateral" (the "Cash Collateral") as such term is defined in section 363(a) of the Bankruptcy Code; (ii) providing adequate protection to U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association, successor by merger to LaSalle Bank National Association for the registered holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2006-CIBC15, Commercial Mortgage Pass-Through Certificates, Series 2006-CIBC15 (the "Mortgage Lender") and Factory Mezz LLC (the "Mezzanine Lender,"

and with the Mortgage Lender, the "Lenders") for any diminution in value of their interests; (iii) authorizing the Debtors to obtain unsecured debt out of the ordinary course of business as an administrative expense for the funding of their operations during the pendency of these chapter 11 cases, to the extent necessary, that shall be allowable as an administrative claim under section 503(b)(1) of the Bankruptcy Code; (iv) vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order; and (v) scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and the entry of a Final Order (as defined herein); and approving the form of notice with respect to the Final Hearing; all as more fully described in the Motion; and the Court having reviewed the Motion and the *Declaration of Steven A. Carlson Pursuant to Local Bankruptcy Rule 1007-2 and 9077-1*, filed contemporaneously with the Motion, and the evidence submitted or adduced and the arguments of counsel made at the interim hearing held on [**_____], 2013 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rule 2002, 4001(b) and (d), and 9014, and it appearing that no further notice need be provided; and the relief requested being within the guidelines for requests for the use of cash collateral set forth in Local Rule 4001-2; and the relief requested in the Motion being in the best interests of the Debtors, their estates and their creditors; and the Court having determined that the legal and factual bases set forth in the Motion and at the Interim Hearing establish just cause for the relief granted herein; and upon all the proceedings before the Court and after due deliberation and sufficient cause appearing therefor,

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

2

A.    <u>Petition Date</u>.  On October 10, 2013 (the "<u>Petition Date</u>"), the Debtors each filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "<u>Chapter 11 Cases</u>").

B.    <u>Debtors in Possession</u>.    The Debtors are continuing in the management and operation of their business and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

C.    <u>Jurisdiction and Venue</u>.    This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these proceedings and over the persons and property affected hereby.  Venue for the Chapter 11 Cases is proper in this district pursuant to 28 U.S.C. § 1408. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

D.    <u>Statutory Committee</u>.  As of the date hereof, the United States Trustee for the Southern District of New York (the "<u>U.S. Trustee</u>") has not appointed an official committee of unsecured creditors (a "<u>Creditors' Committee</u>") in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

E.    <u>Debtors' Stipulations</u>.    The Debtors admit, stipulate and agree that (collectively, paragraphs E(a) through E(g) below are referred to herein as the "<u>Debtors' Stipulations</u>"):

a.    <u>Mortgaged Property</u>.    Leasehold Owner owns the leasehold interests of that certain improved real property located at 47-44 31st Street, Block 282, Lot 1, Long Island City, County of Queens, New York (the "<u>Mortgaged Property</u>").

b.    <u>Mortgage Loan</u>.  Fee Owner and Leasehold Owner are parties to a certain Mortgage Spreader and Amended, Restated and Consolidated Fee and Leasehold

Mortgage, Assignment of Leases and Rents and Security Agreement dated as of May 31, 2006 (the "Senior Mortgage") in the original principal amount of $77,000,000.00 (the "Mortgage Loan").  Pursuant to the Senior Mortgage and other documents ancillary thereto (collectively, the "Senior Loan Documents"), Fee Owner and Leasehold Owner granted liens and security interests in substantially all of their properties to the original lender, CIBC Inc. The Senior Mortgage is currently held by the Mortgage Lender. Fee Owner and Leasehold Owner are jointly and severally liable for the Senior Mortgage. The principal balance on the Mortgage Loan as of October 4, 2013 is approximately $71,559,083.40.

       c.      <u>Mezzanine Loan</u>.  Mezz Borrower is party to a certain Mezzanine Loan Agreement (the "<u>Mezzanine Loan Agreement</u>"), dated as of May 31, 2006, with Petra Mortgage Capital Corp. LLC ("<u>Petra</u>") in the original principal amount of $28,300,000. Pursuant to the Mezzanine Loan Agreement and other documents ancillary thereto (collectively, the "<u>Mezzanine Loan Documents</u>," and together with the Senior Loan Documents, the "<u>Loan Documents</u>"), Mezz Borrower pledged to Petra 100% of its ownership interests in Fee Owner and Leasehold Owner. The Mezzanine Loan is currently held by Mezzanine Lender, as successor to Petra, and is serviced by Atlas Servicing.  The principal balance on the Mezzanine Loan as of October 4, 2013 is approximately $57,022,400.72.

       d.      <u>Guarantee</u>.  Both the Mortgage Loan and the Mezzanine Loan are guaranteed by Mark Karasick, the president of each of the Debtors, and 30th Place Holdings LLC, the sole member of Mezz Borrower under certain circumstances pursuant to the applicable loan documents.

       e.      <u>Validity and Perfection of Mortgage Loan and Mezzanine Loan</u>. The Debtors acknowledge and agree that:  (i) as of the Petition Date, both the Mortgage Loan

(secured by the Mortgaged Property and other collateral (collectively, the "Prepetition Mortgage Collateral"), including all cash generated by the Mortgaged Property, as set forth in the Senior Loan Documents) and the Mezzanine Loan (secured by the equity ownership interest in Fee Owner and Leasehold Owner (the "Prepetition Mezzanine Collateral," and together with the Prepetition Mortgage Collateral, the "Prepetition Collateral")), were valid, binding, enforceable, non-avoidable and properly perfected; (ii) no portion of the Mortgage Loan, the Mortgage Loan Documents, the Mezzanine Loan or the Mezzanine Loan Documents are subject to avoidance, recharacterization, disallowance, disgorgement, recovery or subordination under the Bankruptcy Code or applicable non-bankruptcy law; and (iii) the Debtors and their estates have no claims, objections, challenges, causes of action, and or/choses in action, including without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, against the Lenders or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, managers, members, directors and employees arising out of, based upon or related to the Mortgage Loan or Mezzanine Loan.

f.      Cash Collateral.   The Debtors represent that all of the Debtors' cash generated from the Mortgaged Property, whether as original collateral or profits or proceeds of the Mortgaged Property or other Prepetition Collateral, constitutes Cash Collateral.

g.      Default by the Debtors.   The Debtors acknowledge and stipulate that the Debtors are in default of their debts and obligations under the Loan Documents.

F.      Adequate Protection.   The Mortgage Lender is entitled to receive adequate protection in respect of the Debtors' use of the Prepetition Mortgage Collateral, and any decline in the value thereof, resulting from the (a) use of the Cash Collateral, (b) use, sale or depreciation or other diminution in value of the Prepetition Mortgage Collateral, or (c) as a result of the

5

imposition of the automatic stay under section 362(a) of the Bankruptcy Code (the amount of any such diminution being referred to hereinafter as the "Mortgage Lender Adequate Protection Obligations"). The Mezzanine Lender is entitled to receive adequate protection in respect of the Debtors' use of the Prepetition Mezzanine Collateral, and any decline in the value thereof, resulting from the (a) use of the Cash Collateral, (b) use, sale or depreciation or other diminution in value of the Prepetition Mortgage Collateral, or (c) as a result of the imposition of the automatic stay under section 363(a) of the Bankruptcy Code (the amount of any such diminution being referred to hereinafter as the "Mezzanine Lender Adequate Protection Obligations," and together with the Mortgage Lender Adequate Protection Obligations, the "Adequate Protection Obligations"). Pursuant to sections 361, 363, and 507(b), as adequate protection for the Adequate Protection Obligations, the Debtors have agreed to provide the Lenders with: (a) the Mortgage Lender Adequate Protection Liens and Mezzanine Lender Adequate Protection Liens; and (b) the Mortgage Lender Adequate Protection Superpriority Claims and Mezzanine Lender Adequate protection Superpriority Claims (each as defined below). Further, the Debtors have agreed to provide the Mortgage Lender with the Adequate Protection Payments (as defined below). The Lenders have objected to the use by the Debtors of the Cash Collateral, except on the terms and conditions set forth in this Interim Order.

G.    Necessity of Relief Requested.    The Debtors require the use of Cash Collateral in order to finance their operations, absent which immediate and irreparable harm will result to the Debtors, their estates and creditors, and the prospects for a successful conclusion of the Chapter 11 Cases. In the absence of the use of Cash Collateral, it would be impossible for the Debtors to continue to operate their business, even for a limited period of time, and serious and irreparable harm to the Debtors, their estates and creditors would occur. The Debtors do not

6

have sufficient available sources of working capital and financing to maintain the Mortgaged Property without the use of Cash Collateral. Further, in the event that the Cash Collateral is insufficient to fund the Debtors' operations during the pendency of the Chapter 11 Cases, the Debtors require a source of unsecured financing. The relief requested in the Motion is, therefore, of the utmost significance and importance to the preservation and maintenance of the value of the Debtors' assets. The Lenders and the Debtors have negotiated at arms' length and in good faith regarding the Debtors' use of Cash Collateral to fund the continued operations of the Debtors for the period through the Termination Declaration Date (as defined below), all subject to the terms and conditions set forth in this Interim Order, including the protection afforded an entity acting in "good faith" under section 363(m) of the Bankruptcy Code. Based on the record presented to the Court at the Interim Hearing, the terms of the proposed adequate protection arrangements and the use of the Cash Collateral are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration. Entry of this Interim Order is in the best interests of the Debtors and their estates.

H.    <u>Chief Restructuring Officer</u>. Prior to the Petition Date, the Debtors engaged Steven A. Carlson as the Debtors' Chief Restructuring Officer (the "<u>CRO</u>") to oversee all aspects of the Debtors' business and operations pursuant to a certain Employment Agreement (the "<u>Employment Agreement</u>"). The CRO continues to manage the Debtors on a postpetition basis pursuant to the terms of the Employment Agreement.

I.    <u>Final Hearing</u>. At the Final Hearing, the Debtors will seek final approval of the relief requested in the Motion for the proposed use of Cash Collateral on a final basis

pursuant to a final order (the "Final Order"), notice of which Final Hearing will be provided in accordance with this Interim Order.

        J.    Notice.  Notice of the Interim Hearing and emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, email, overnight courier or hand delivery, to certain parties in interest, including counsel to each of the Lenders, counsel to CIBC Inc., counsel to Petra, the U.S. Trustee, and all those creditors holding unsecured claims against the Debtors' estates (on a consolidated basis).  The parties have made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the interim relief set forth in this Interim Order, and no other or further notice is or shall be required.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

        1.    Motion Granted.  The Motion is GRANTED, and the use of Cash Collateral on an interim basis is authorized, subject to the terms and conditions set forth in this Interim Order.

        2.    [**Objections Overruled.  All objections to the Motion to the extent not withdrawn or resolved are hereby overruled.]

        3.    Authorization to Use Cash Collateral.  Subject to the terms of this Interim Order, pursuant to section 363(c)(2) of the Bankruptcy Code, the Debtors are authorized to use Cash Collateral for the period (the "Subject Period") from the Petition Date through the date which is the earliest to occur of (a) December 31, 2013; or (b) a Termination Declaration Date strictly pursuant to and in accordance with the Budget attached hereto as Exhibit A (the "Budget") to satisfy (in the order of) (i) all payments to be made for insurance and taxes; and (ii) operational costs and expenses arising in connection with the administration of the Debtors'

8

estates.   The Debtors may move amounts between line items on the Budget consistent with

reasonable financial practice, may not exceed any line items on the Budget by more than 5%

without the Lenders' permission and may apply unused amounts for any line item on the Budget

towards the payment of any other line item on the Budget.   Upon the date of the expiration of the

Subject Period (the "Expiration Date"), Debtors' authority to use Cash Collateral shall cease

absent further Order of this Court.

      4.    Cash Management.    The Debtors are hereby authorized to establish,

maintain and use certain bank accounts with respect to the Cash Collateral on a postpetition basis

as follows:

      a.    The Debtors are authorized to open two (2) "debtor in possession"

bank accounts (collectively, the "New Bank Accounts") with Capital One.   These New Bank

Accounts include an operating account and a payroll account.   On and after the Petition Date, the

Debtors will use the New Bank Accounts to collect, transfer, and disburse funds generated by the

Mortgaged Property in the ordinary course of business.   The Debtors will manage their cash

receipts, transfers and disbursements and record such collections, transfers and disbursements

through the New Bank Accounts, as well as through the continuance of the lock box currently in

place (the "Lock Box").   The Debtors will (i) deposit funds in and withdraw funds from the New

Bank Accounts and the Lock Box by all usual means, including, without limitation, checks, wire

transfers and other debits; and (ii) pay any ordinary course bank fees incurred after the Petition

Date in connection with the New Bank Accounts and the Lock Box.

      b.    The Debtors are authorized and empowered to continue to manage

their cash for the purpose of maintaining and paying the expenses of the Mortgaged Property and

related obligations in a manner similar to that utilized prior to the commencement of their

Chapter 11 Cases and to transfer funds between its bank accounts as and when needed and in the amounts necessary or appropriate to maintain their operations and to facilitate the orderly operation of their estates.

        c.      The Debtors shall maintain records in a manner consistent with their prepetition practices, of transfers within the cash management system so that postpetition transfers and transactions shall be adequately documented in, and readily ascertainable from, their books and records, to the same extent maintained by the Debtors prior to the commencement of these Chapter 11 Cases.

        d.      The CRO shall have the authority to engage the current manager of the Mortgaged Property, Newmark & Company Real Estate d/b/a Newmark Grubb Knight Frank (the "Manager") to manage the Mortgaged Property, including the collection of rent from tenants of the Mortgaged Property, consistent with prepetition practices. The Manager shall periodically submit requests for approval of payments to the CRO for ultimate approval, detailing all ordinary course payments for which it seeks approval. Upon the written approval of the CRO, the Manager shall remit payments of these ordinary course expenditures from the general operating account established in connection with the filing of these Chapter 11 Cases (the "Operating Account"). The Manager may not make any payments that are (a) not in the ordinary course of business, (b) not approved by the CRO, or (c) inconsistent with the Budget absent prior approval from the CRO.

        5.      Budget Maintenance. The Budget and any modifications to, or extensions, amendments or updates of, the Budget shall be in form and substance acceptable to and approved in writing by the Lenders, each in its sole discretion. The Budget may be amended or modified in writing from time to time only with the written consent of the Lenders, each in its sole

discretion.  The Debtors shall deliver to the Lenders on or before the close of business of the

fifteenth day of each month (and if such day is not a business day, then the next succeeding

business day) a (i) comparison for the prior month of actual results of all items contained in the

Budget to the amounts originally contained in the Budget and (ii) cumulative comparison for the

period from the Petition Date through the end of the prior month of the actual results of all items

contained in the Budget to the amounts originally contained in the Budget, in each case along

with such supporting information and additional reporting as the Lenders may request.

6.    Mortgage Lender Adequate Protection Liens.    As adequate protection

against any diminution in value of the Mortgage Lender's interest in the Mortgage Prepetition

Collateral, the Mortgage Lender is hereby granted (effective and perfected as of the Petition Date

and without the necessity of the execution by the Debtors of mortgages, security agreements,

pledge agreements, financing statements or other agreements) a valid and perfected replacement

security interest in, and lien on (the "Mortgage Lender Adequate Protection Liens"), all of the

right, title and interest of the Debtors in, to and under all present and after-acquired property and

assets of the Debtors of any nature whatsoever, whether real or personal, tangible or intangible,

wherever located, including, without limitation, all cash and Cash Collateral of the Debtors

(whether maintained with the Mortgage Lender or any other financial institution) and any

investment of such cash and Cash Collateral, goods, cash-in-advance deposits, contracts, causes

of action, general intangibles, accounts receivable, and other rights to payment, whether arising

before or after the Petition Date, chattel paper, documents, instruments, interests in leaseholds,

real properties, plants, machinery, equipment, patents, copyrights, trademarks, trade names or

other intellectual property, licenses, insurance proceeds, and tort claims, and any and all of the

proceeds, products, offspring, rents and profits thereof, rights under letters of credit, capital stock

11

and other equity or ownership interests held by the Debtors, including equity interests in subsidiaries and all other investment property, and the proceeds of all of the foregoing, whether now existing or hereafter acquired (collectively, the "Mortgage Collateral"), provided, however, that the Mortgage Collateral shall not include the Debtors' claims and causes of action under section 544, 545, 547, 548, 549 or 550 of the Bankruptcy Code (collectively, the "Avoidance Actions") or proceeds thereof.  Subject to the Carve-Out (as defined below), the Mortgage Lender Adequate Protection Liens shall be (i) first priority perfected liens on all of the Collateral (defined below)  that is not otherwise encumbered by validly perfected, non-avoidable security interests or liens as of the Petition Date, (ii) first priority perfected liens on all of the Collateral as to which the Mortgage Lender had a first priority lien as of the Petition Date, even if such Collateral is subject to a validly perfected lien that is junior to the lien of the Mortgage Lien, and (iii) junior perfected liens on all Collateral that is subject to a validly perfected lien with priority over the Mortgage Lender's liens as of the Petition Date.

7.    Priority of Adequate Protection Liens. The Mortgage Lender Adequate Protection Liens shall be enforceable against the Debtors, their estates and any successors thereto, including without limitation, any trustee or other estate representative appointed in the Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, a "Successor Case").  Except as provided herein, the Mortgage Lender Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter entered in the Chapter 11 Cases or any Successor Case, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Case, or upon the dismissal of the Chapter 11 Cases or any Successor Case.  The

Mortgage Lender Adequate Protection Liens shall not be subject to sections 506(c) (effective upon entry of the Final Order), 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the Mortgage Lender Adequate Protection Liens.

8.    <u>Mortgage Lender Adequate Protection Superpriority Claims</u>.  As further adequate protection against any diminution in value of the interests of the Mortgage Lender in the Mortgage Prepetition Collateral, the Mortgage Lender is hereby granted as and to the extent provided by, sections 503(b) and 507(b) of the Bankruptcy Code allowed superpriority administrative expenses claims in the Chapter 11 Cases and any Successor Case in the amount of the Mortgage Lender Adequate Protection Obligations (the "<u>Mortgage Lender Adequate Protection Superpriority Claim</u>").  The Mortgage Lender Adequate Protection Superpriority Claim shall not attach to Avoidance Actions or proceeds thereof.

9.    <u>Priority of Mortgage Lender Adequate Protection Superiority Claims</u>. The Mortgage Lender Adequate Protection Superpriority Claims shall be junior only to the Carve-Out (as defined herein). Except for the Carve-Out, the Mortgage Lender Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code.

10.    <u>Adequate Protection Payments.</u>  As additional adequate protection against any diminution in value of the interests of the Mortgage Lender in the Prepetition Mortgage

13

Collateral, commencing with the first full calendar month following the Petition Date, the Mortgage Lender shall receive adequate protection payments (the "Adequate Protection Payments") from the Debtors, payable monthly on the first (1st) day of each calendar month, in an amount equal to the interest at the non-default, contract rate that has accrued in connection with the Mortgage Loan as of the date of such Adequate Protection Payment. The Adequate Protection Payments received by the Mortgage Lender pursuant to this Paragraph 10 shall be subject to claims pursuant to section 506 of the Bankruptcy Code with respect to recharacterization; provide, however, the Mortgage Lender reserves all rights to contest recharacterization.

11.     Mezzanine Lender Adequate Protection Liens.  As adequate protection against any diminution in value of the Mezzanine Prepetition Collateral, the Mezzanine Lender is hereby granted (effective and perfected as of the Petition Date and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or other agreements) a valid and perfected replacement security interest in, and lien on (the "Mezzanine Lender Adequate Protection Liens"), all of the right, title and interest of the Debtors in the Prepetition Mezzanine Collateral (the "Mezzanine Collateral," and together with the Mortgage Collateral, the "Collateral"), provided, however, that the Mezzanine Collateral shall not include the Prepetition Mortgage Collateral or the Mortgage Collateral or Avoidance Actions (or proceeds thereof).  Subject to the Carve-Out (as defined below) and the Mortgage Lender Adequate Protection Liens, the Mezzanine Lender Adequate Protection Liens shall be (i) first priority perfected liens on all of the Mezzanine Collateral that is not otherwise encumbered by validly perfected, non-avoidable security interests or liens as of the Petition Date, and (ii) junior perfected liens on all Mezzanine Collateral that is subject to a validly perfected lien,

14

including any lien with priority over the Mezzanine Lender's liens as of the Petition Date; provided however, that the Mezzanine Lender Adequate Protection Liens shall be subordinate to the Mortgage Lender's Adequate Protection Liens.

12.    _Priority of Mezzanine Lender Adequate Protection Liens_. The Mezzanine Lender Adequate Protection Liens shall be enforceable against the Debtors, their estates and any successors thereto, including without limitation, any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Case.  The Mezzanine Lender Adequate Protection Liens shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Case, or upon the dismissal of the Chapter 11 Cases or any Successor Case.  The Mezzanine Lender Adequate Protection Liens shall not be subject to sections 506(c) (effective upon entry of the Final Order), 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be made _pari passu_ with or senior to the Mezzanine Lender Adequate Protection Liens.

13.    _Mezzanine Lender Adequate Protection Superpriority Claims_.  As further adequate protection against any diminution in value of the interests of the Mezzanine Lender in the Prepetition Mezzanine Collateral, the Mezzanine Lender is hereby granted as and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code allowed superpriority administrative expenses claims in the Chapter 11 Case and any Successor Case in the amount of the Adequate Protection Obligations (the "_Mezzanine Lender Adequate Protection Superpriority Claim_").  For the avoidance of doubt, the Mezzanine Lender Adequate Protection Superpriority Claim shall be junior only to the Carve-Out and the Mortgage Lender's Adequate Protection

15

Superpriority Claim. The Mezzanine Lender Adequate Protection Superpriority Claims shall not attach to Avoidance Actions or the proceeds thereof.

14. <u>Authorization to Incur Unsecured Debt</u>. To the extent Cash Collateral is insufficient to fund the Debtors' operations and/or the costs of the Chapter 11 Cases, the Debtors are hereby authorized to incur additional unsecured debt from the Mezzanine Lender and the Debtors' principals. Such credit shall be entitled to administrative status pursuant to sections 364(b) and 503(b)(1) of the Bankruptcy Code. Pursuant to the Debtors' chapter 11 plan (the "<u>Plan</u>"), to the extent that the Plan is confirmed, any claims held by Mezzanine Lender and the Debtors' principals as a result of such postpetition financing shall be waived.

15. <u>Modification of Automatic Stay</u>. The automatic stay under Bankruptcy Code section 362(a) is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to: (a) permit the Debtors to grant the Adequate Protection Liens and Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as the Lenders may request in their respective sole discretion to assure the perfection and priority of the liens granted herein; and (c) authorize the Debtors to pay, and the Lenders to retain and apply, payments made in accordance with the terms of this Interim Order, <u>provided</u>, <u>however</u>, any stay relief with respect to the exercise of remedies shall be in accordance with Paragraph 13 or as otherwise ordered by the Court.

16. <u>Perfection of Adequate Protection Liens</u>. This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Adequate Protection Liens, without the necessity of filing or recording any mortgage, financing statement or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering

16

into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the Adequate Protection Liens, or to entitle the Lenders to the priorities granted herein.   Notwithstanding the foregoing, the Debtors are authorized and directed to execute and deliver promptly to the Lenders all such financing statements, mortgages, notices and other documents as the Lenders may reasonably request, and the Lenders may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instruments.

17.    <u>The Debtors' Obligations</u>.  The Debtors shall, through the CRO:

a.    Utilize Cash Collateral to pay the expenses of its operation of its business as provided in the Budget, in consultation with the Manager and subject to the approval of the CRO;

b.    Deliver to the Lenders on or before the close of business on the fifteenth day of each month (and if such day is not a business day, then the next succeeding business day) a (i) comparison for the prior month of actual results of all items contained in the Budget to the amounts originally contained in the Budget and (ii) cumulative comparison for the period from the Petition Date through the end of the prior week of the actual results of all items contained in the Budget to the amounts originally contained in the Budget, in each case along with such supporting information as the Lenders may request; and

c.    Serve the Lenders and their counsel with a copy of each monthly operating report filed by the Debtors in these Chapter 11 Cases as required by the Court, the U.S. Trustee or applicable law.

18.      Disposition of Collateral. The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any material portion of the Mortgage Collateral or Mezzanine without the prior written consent of the Mortgage Lender and Mezzanine Lender, respectively.

19.      Events of Default. The occurrence of any of the following events, unless waived by the Lenders, shall constitute an event of default (collectively, the "Events of Default"):

a.      the failure by the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order;

b.      the Debtors' obtaining of credit or the incurring of indebtedness that is (i) secured by a security interest, mortgage or other lien on all or any portion of the Collateral which is equal or senior to any security interest, mortgage or other lien of the Lenders, or (ii) entitled to priority administrative status that is equal or senior to that granted to the Lenders;

c.      any lien or security interest purported to be created under the Loan Documents shall cease to be, or shall be asserted by Debtors not to be, a valid and perfected lien on, or security interest in, any Collateral, with the priority required by the Loan Documents or herein;

d.      the entry of an order by the Court granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor to execute upon or enforce a lien on or security interest in any Collateral having a value in excess of $100,000.00, or (ii) with respect to any lien on or the granting of any lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case would

have a material adverse effect on the business, operations, property, assets, or condition, financial or otherwise, of the Debtors;

        e.      reversal, vacatur, or modification (other than a modification with the express prior written consent of the Lenders) of this Interim Order;

        f.      dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases to chapter 7 cases, or appointment in the Chapter 11 Case of a chapter 11 trustee or examiner with enlarged powers or other responsible person;

        g.      any misrepresentation of a material fact made after the Petition Date by the Debtors or its agents to the Lenders about the financial condition of the Debtors, the nature, extent, location or quality of any Collateral, or the disposition or use of any Collateral, including Cash Collateral;

        h.      a default by the Debtors in reporting financial information as and when required under this Interim Order;

        i.      the sale of any material portion of the Debtors' assets outside the ordinary course of business without the prior written consent of both of the Lenders, each in its sole discretion;

        j.      the failure to obtain entry of the Final Order by the Court within thirty (30) days following the Petition Date;

        k.      the failure to obtain entry of an order of the Bankruptcy Court confirming the Plan on or before February 10, 2013, unless otherwise agreed to in writing by both of the Lenders, or as contemplated specifically by the PSA (defined below);

l.    the occurrence of any Plan Support Default, as defined in that certain Plan Support and Cooperation Agreement, dated October 2, 2013, between and among Mortgage Lender, Mezzanine Lender, Debtors, Mark Karasick and 30th Place Holdings LLC;

m.    the failure to comply with the Budget for any period, measured weekly as of the close of business on Wednesday of each following work week; or

n.    the filing by the Debtors of any motion seeking, or the granting of any motion providing for, reversal or modification of this Interim Order.

20.    <u>Rights and Remedies Upon Event of Default</u>. Immediately upon the occurrence and during the continuation of an Event of Default, either Lender may declare a termination, reduction or restriction of the ability of the Debtors to use any Cash Collateral (any such declaration, shall be referred to herein as a "<u>Termination Declaration</u>"). The Termination Declaration shall be given by email or facsimile (or other electronic means) to counsel to the Debtors, counsel to any Creditors' Committee, counsel to the other Lender, and the U.S. Trustee (the earliest date any such Termination Declaration is made shall be referred to herein as the "<u>Termination Declaration Date</u>"). Upon the passage of five (5) days from the Termination Declaration Date, the Debtors' right to use Cash Collateral shall automatically cease unless the Debtors shall have cured such Event of Default in full prior to the expiration of such five (5) day period, and the Debtors shall no longer have the right to use Cash Collateral. During such five (5) day period, the Debtors and the Creditors' Committee, if any, shall have the right to seek a hearing solely for the purpose of seeking a determination of whether an Event of Default has occurred; upon the filing of a motion on shortened notice seeking such a determination on an expedited bases, the expiration of the five (5) day period shall be tolled pending the Court's decision on such motion. Upon the passage of seven (7) days from the Termination Declaration

Date, the automatic stay shall automatically be terminated without further notice or order, and the Debtors shall no longer have the right to use Cash Collateral and the Lenders shall be permitted to exercise all remedies set forth herein in the Plan and in the Loan Documents, as applicable, and as otherwise available at law against the Collateral, without further order of or application or motion to the Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the liens and security interest in the Collateral or any other rights and remedies granted to the Lenders with respect thereto pursuant to the Loan Documents or this Interim Order, as applicable.

21.    Carve-Out. Subject to the terms and conditions contained in this Paragraph 21, the Adequate Protection Liens and the Adequate Protection Superpriority Claims shall be subordinate to the following (collectively, the "Carve-Out"): (i) fees pursuant to 28 U.S.C. § 1930(a)(6); (ii) fees payable to the clerk of the Bankruptcy Court and any agent thereof; and (iii) pursuant to section 726(b) of the Bankruptcy Code, reasonable fees and expenses of a trustee that are incurred after the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, in an amount not to exceed $50,000.00; (iv) professional fees and expenses incurred by professionals retained pursuant to sections 327(a) and 1103 of the Bankruptcy Code by the Debtors and the Creditors' Committee (if such committee should be appointed, in an amount not to exceed $50,000.00); and (v) the $75,000.00 amount provided by Mezzanine Lender prior to the Petition Date for the payment of Debtors' legal fees (collectively, the "Professional Fees").  Payment of any obligations within the Carve-Out shall not and shall not be deemed to reduce the Mortgage Loan or the Mezzanine Loan or the Adequate Protection Obligations and shall not and shall not be deemed to subordinate the Adequate Protection Liens or the Adequate Protection Superpriority Claims to any junior prepetition or postpetition lien,

21

interest, or claim in favor of any other party.  Nothing in this Paragraph 19 shall alter the

requirements for Court approval and allowance of Professional Fees or the rights of the Debtors,

the Mortgage Lender, the Mezzanine Lender or any other party-in-interest to object to the award

of Professional Fees in accordance with any applicable Bankruptcy Rule or, if applicable, order

of the Court relating to the approval of Professional Fees and objections thereto.

22.    <u>Limitations on the Cash Collateral and the Carve-Out</u>.    The Cash

Collateral may only be used in accordance with the Budget and, in any event, the Cash Collateral

and the Carve-Out may not be used:  (a) in connection with, or to finance in any way, any action,

suit, arbitration, proceeding, application, motion or other litigation of any type (i) against the

Lenders or seeking relief that would impair the Lenders' rights and remedies under the Loan

Documents, the Plan or this Interim Order, including, without limitation, (A) to assert,

commence, or prosecute any claims or causes of action whatsoever, including, without

limitation, any actions under chapter 5 of the Bankruptcy Code, against the Lenders, (B) to

prosecute an objection to, contest in any manner, or raise any defenses to, the validity, extent,

amount, perfection, priority, or enforceability of any of the rights and obligations of the Lenders

or seeking affirmative relief against the Lenders, or (C) for the payment of any services rendered

by the professionals retained by the Debtors or any Creditors' Committee in connection with the

assertion of, or joinder in, any claim, counterclaim, action, proceedings, application, motion,

objection, defense or other contested matter, the purpose of which is to seek, or the result of

which would be to obtain, any order, judgment determination, declaration or similar relief that

would impair the ability of the Mortgage Lender to recover on the Mortgage Loan or the

Mezzanine Lender to recover on the Mezzanine Loan, (ii) invalidating, setting aside, avoiding or

subordinating, in whole or in part, the Mortgage Loan or the Mezzanine Loan, (iii) for monetary,

injunctive or other affirmative relief against the Lenders or their collateral, or (iv) preventing,

hindering or otherwise delaying the exercise by the Lenders of any rights and/or remedies under

this Interim Order, the Loan Documents, or applicable law, or the enforcement of realization

(whether by foreclosure, credit bid, further order of the Court or otherwise) by the Lenders upon

any of the Collateral; (b) to make any distribution under the Plan; (c) to make any payment in

settlement of any claim, action or proceeding, before any court, arbitrator or other governmental

body without prior written consent of the Lenders, unless otherwise ordered by the Court; (d) to

pay any fees or similar amounts to any person who has proposed or may propose to purchase

interests in the Debtors without the prior written consent of the Lenders, (e) to object, contest, or

interfere with in any way the enforcement or realization upon any of the Collateral by the

Lenders once an Event of Default has occurred; (f) to sell or otherwise dispose of Collateral

without the prior consent of the Lenders; (g) to pay indebtedness outside the ordinary course of

business without the prior consent of the Lenders; (h) to object to or challenge in any way the

claims, liens, or interests (including interests in the Collateral) held by or on behalf of the

Lenders; or (i) to pay any costs or expenses that are not ordinary course operating expenses of

the Debtors; provided, however, that in the event a Creditor's Committee is appointed in these

Chapter 11 Cases, Cash Collateral in an amount to be determined at the Final Hearing may be

used for the Creditor's Committee for allowed fees and expenses incurred solely by the

Creditor's Committee to conduct an investigation with respect to the validity, amount, extent,

perfection, priority, enforceability, or avoidability of the Mortgage Loan, Mezzanine Loan and

Prepetition Collateral of the Debtors.

23.    <u>No Third Party Rights</u>. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

24.    <u>Section 506(c) Claims</u>. Upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases at any time shall be charged against the Lenders or any of their claims or the Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise.

25.    <u>No Marshaling/Application of Proceeds</u>. Upon entry of the Final Order, the Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral, as the case may be, and proceeds shall be received and applied in accordance with this Interim Order notwithstanding any other agreement or provision to the contrary.

26.    <u>Rights Preserved</u>. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the Lenders' right to seek any other or supplemental relief in respect of the Debtors, including the right to seek additional adequate protection; (b) any of the rights of the Lenders under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of the Chapter 11 Cases or any Successor Case, conversion of the Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans.  Notwithstanding anything to the contrary, the U.S. Trustee reserves its rights to review any line item on the Budget pending entry of a Final Order.

24

27.    <u>Section 507(b) Reservation</u>. Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Lenders hereunder is insufficient to compensate for any diminution in value of the Lenders' interests in the Prepetition Collateral during the Chapter 11 Cases or any Successor Case.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgement by the Lenders, that the adequate protection granted herein does in fact adequately protect the Lenders against any diminution in value of their interest in the Prepetition Collateral (including Cash Collateral).

28.    <u>Credit Bidding</u>. To the extent allowed by the Bankruptcy Code, any plan or motion seeking to sell substantially all the Collateral shall provide for and allow credit bidding by the Lenders, whether under: (a) section 363(k) of the Bankruptcy Code in the case of a sale under section 363(b) of the Bankruptcy Code, or (b) a plan provision consistent with the language of section 363(k) of the Bankruptcy Code, including, without limitation, section 1129(b)(2)(a)(iii).

29.    <u>No Waiver by Failure to Seek Relief</u>.  The failure of the Lenders to seek relief or otherwise exercise their rights and remedies under this Interim Order or applicable law, as the case may be, shall not constitute a waiver of any rights hereunder, thereunder, or otherwise of the Lenders.

30.    <u>Proofs of Claim</u>.  The Lenders will not be required to file a proof of claim in the Chapter 11 Cases or a Successor Case for their claims to be allowed, and the Debtors' Stipulations shall be deemed to constitute a timely filed proof of claim.  Any order entered by the Court in relation to the establishment of a bar date for any claim (including, without limitation,

administrative claims) in the Chapter 11 Cases or a Successor Case shall not apply to the Lenders.

31.     _Good Faith_.  The Lenders have acted in good faith in connection with this Interim Order and their reliance on this Interim Order is in good faith.

32.     _Binding Effect of Interim Order_.   This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable _nunc pro tunc_ to the Petition Date immediately upon execution thereof. Immediately upon entry by this Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the Lenders, the U.S. Trustee, all other creditors of any of the Debtors, any committee appointed in the Chapter 11 Cases, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Chapter 11 Cases, any Successor Case, or upon dismissal of the Chapter 11 Cases or a Successor Case. In the event of any inconsistency between the provisions of this Interim Order and any other order (including any "First Day" orders), the provisions of this Interim Order shall govern and control.  Any payments to be made under any order (including any "First Day" order) shall be made in accordance with this Interim Order and the Budget.

33.     _No Modification of Interim Order_. The Debtors irrevocably waive any right to seek any amendment, modification or extension of this Interim Order without the prior written consent of the Lenders, and no such consent shall be implied by any other action, inaction or acquiescence of the Lenders.  In the event any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of this Court or any other court, such modification, amendment or vacatur shall not affect the validity, perfection,

priority, allowability, enforceability or non-availability of any advances, payments or use of cash whether previously made or made hereunder, or lien, claim or priority authorized or created hereby.  Any liens or claims granted to the Lenders hereunder arising prior to the effective date of any such modification, amendment or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

34.    <u>Survival</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of liquidation in the Chapter 11 Cases; (b) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (c) dismissing the Chapter 11 Cases or any Successor Case; or (d) pursuant to which this Court abstains from hearing the Chapter 11 Cases or a Successor Case. The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the Lenders pursuant to this Interim Order, notwithstanding the entry of any such order, shall continue in the Chapter 11 Cases, in any Successor Case, or following dismissal of the Chapter 11 Cases or any Successor Case, and shall maintain their priority as provided by this Interim Order until the Mortgage Loan has been indefeasibly paid in full.

35.    <u>Final Hearing</u>.  A final hearing on the Motion is scheduled for [_____], 2013 at [___] a.m. (Eastern Time) before the Honorable [_____], United States Bankruptcy Court for the Southern District of New York.  On or before [_____], 2013, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "<u>Final Hearing Notice</u>"), together with a copy of this Interim Order and the Motion on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for any

Creditors' Committee.  The Final Hearing Notice shall state that any party-in-interest objecting

to the relief requested in the Motion on a final basis shall file written objections with the Clerk of

the Court no later than [_____], 2013 at [___] p.m. (Eastern Time), which objections shall be

served so as to be received on or before such date by: : (i) proposed counsel to the Debtors,

Klestadt & Winters, LLP, 570 Seventh Avenue, 17th Floor, New York, New York 10018-6314,

Attn:  Tracy L. Klestadt and Joseph C. Corneau; (ii) counsel to the Mortgage Lender, Weil,

Gotshal & Manges LLP, 767 Fifth Avenue, New York New York 10153, Attn:  Alfredo Perez;

(iii) counsel to the Mezzanine Lender, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., 666

Third Avenue, New York, New York 10017, Attn:  John H. Bae and Kaitlin R. Walsh; (iii)

counsel to any Creditors' Committee; and (iv) the Office of the U.S. Trustee for the Southern

District of New York, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York,

New York 10014, Attn: Paul Schwartzberg.

      36.    <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to

enforce this Interim Order according to its terms.


Dated: _____, 2013
      New York, New York



_____
    UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT A

**(Budget)**

NEWMARK & COMPANY REAL ESTATE, INC.
SUMMARY OPERATING BUDGET:
LIC CROWN LEASEHOLD OWNER, LLC

13-13304 Doc 4    Filed 10/10/13    Entered 10/10/13 15:14:26    Main Document
Pg 58 of 64

10-Oct-13
2:50 PM
04BUDGET.XLS

**POST BANKRUPTCY BUDGET 2013-2014**

|  | OCT | NOV | DEC | JAN | FEB | Total |
|---|---|---|---|---|---|---|
| **PROJECTED REVENUES** | | | | | | |
| Base Rent | 819,897 | 819,897 | 755,740 | 750,456 | 754,819 | **3,900,809** |
| Free Rent | 0 | 0 | 0 | (5,824) | (5,824) | **(11,648)** |
| Electric Inclusion | 0 | 0 | 0 | 0 | 0 | **0** |
| Electric Meter | 37,462 | 36,258 | 38,996 | 0 | 0 | **112,716** |
| Real Estate Escalation | 8,273 | 8,273 | 8,273 | 40,555 | 40,344 | **105,718** |
| Operating Escalations | 0 | 0 | 0 | 2,750 | 22,216 | **24,966** |
| Garage Income | 16,815 | 16,815 | 16,815 | 8,366 | 8,366 | **67,177** |
| Water/Sprinkler Income | 1,141 | 15,439 | 1,091 | 2,000 | 2,000 | **21,671** |
| Elevator Service Income | 2,000 | 2,000 | 2,000 | 21,720 | 21,720 | **49,440** |
| Roof/Satellite Income | 1,740 | 1,740 | 1,740 | 1,740 | 1,740 | **8,700** |
| Storage Rent | 0 | 0 | 0 | 0 | 0 | **0** |
| Interest Income | 50 | 50 | 50 | 50 | 50 | **250** |
| Collection Allowance - 4.0% | (35,493) | (36,017) | (32,986) | (33,103) | (34,048) | **(171,648)** |
| **TOTAL REVENUE** | **851,885** | **864,456** | **791,718** | **788,709** | **811,383** | **4,108,151** |

NEWMARK & COMPANY REAL ESTATE, INC.
SUMMARY OPERATING BUDGET
LIC CROWN LEASEHOLD OWNER, LLC

13-13502-mg   Doc 4   Filed 10/10/13   Entered 10/10/13 15:14:26   Main Document
Pg 59 of 64

10-Oct-13
2:50 PM
04BUDGET.XLS

**POST BANKRUPTCY BUDGET 2013-2014**

| | OCT | NOV | DEC | JAN | FEB | Total |
|---|---|---|---|---|---|---|
| **OPERATING EXPENSES** | | | | | | |
| PAYROLL & FRINGES | 75,839 | 75,699 | 89,419 | 77,792 | 77,652 | **396,401** |
| FIRE GUARDS | 78,280 | 25,000 | 25,000 | 25,000 | 25,000 | **178,280** |
| CLEANING | 800 | 800 | 800 | 3,000 | 1,600 | **7,000** |
| ELECTRICITY & GAS | 96,953 | 80,682 | 219,145 | 102,260 | 160,531 | **659,572** |
| FUEL | 0 | 0 | 0 | 0 | 0 | **0** |
| WATER & SEWER | 0 | 40,000 | 0 | 0 | 40,000 | **80,000** |
| SANITATION & EXTERMINATION | 2,181 | 2,181 | 2,181 | 2,181 | 2,181 | **10,905** |
| SECURITY | 1,500 | 0 | 0 | 0 | 200 | **1,700** |
| MISCELLANEOUS OPERATING | 6,800 | 4,400 | 5,672 | 10,800 | 1,000 | **28,672** |
| | | | | | | |
| **SUBTOTAL OPERATING** | 262,353 | 228,762 | 342,218 | 221,033 | 308,164 | **1,362,530** |
| | | | | | | |
| **REPAIRS & MAINTENANCE** | | | | | | |
| REPAIRS - EXCLUDING ELEVATOR | 22,150 | 8,050 | 8,350 | 7,150 | 8,050 | **53,750** |
| ELEVATOR REPAIRS | 7,900 | 7,900 | 7,900 | 7,900 | 7,900 | **39,500** |
| | | | | | | |
| **TOTAL REPAIRS & MAINTENANCE** | 30,050 | 15,950 | 16,250 | 15,050 | 15,950 | **93,250** |
| | | | | | | |
| **ADMINISTRATIVE EXPENSES** | | | | | | |
| MANAGEMENT FEES - AGENT | 20,747 | 21,008 | 19,493 | 16,435 | 16,908 | **94,591** |
| MISC ADMINISTRATIVE EXPENSES | 66,887 | 51,767 | 51,687 | 68,387 | 22,345 | **261,073** |
| | | | | | | |
| **TOTAL ADMINISTRATIVE** | 87,634 | 72,775 | 71,180 | 84,822 | 39,253 | **355,664** |
| | | | | | | |
| **TOTAL OPERATING EXPENSES** | 380,037 | 317,488 | 429,648 | 320,905 | 363,367 | **1,811,444** |
| | | | | | | |
| **INSURANCE** | 34,348 | 34,348 | 34,348 | 34,348 | 34,348 | **171,738** |
| **REAL ESTATE TAXES** | 111,246 | 111,246 | 111,246 | 95,366 | 95,366 | **524,471** |
| | | | | | | |
| **TOTAL RE TAX & INS.** | 145,594 | 145,594 | 145,594 | 129,714 | 129,714 | **696,210** |
| | | | | | | |
| **TOTAL EXPENSES** | 525,631 | 463,082 | 575,242 | 450,619 | 493,080 | **2,507,654** |
| | | | | | | |
| **NET OPERATING INCOME** | 326,254 | 401,374 | 216,476 | 338,090 | 318,302 | **1,600,497** |
| | | | | | | |
| **Capital Expenditures** | | | | | | |
| Fire alarm upgrades - core | | 101,667 | 91,667 | 101,667 | | 295,000 |
| Fire alarm upgrades - tenant | | 25,000 | 25,000 | 25,000 | 25,000 | 100,000 |
| Building engineering surveys | 25,000 | 25,000 | | | | 50,000 |
| Electrical distribution upgrades | | 10,000 | 10,000 | 10,000 | 10,000 | 40,000 |
| Violations removal | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 50,000 |
| Vacant floor prep (demo, white-box) | | 50,000 | 50,000 | 50,000 | 50,000 | 200,000 |
| Leasing/marketing allowance | | 25,000 | 25,000 | 25,000 | 25,000 | 100,000 |

NEWMARK & COMPANY REAL ESTATE, INC.
SUMMARY OPERATING BUDGET:
LIC CROWN LEASEHOLD OWNER, LLC

13-13304-mg  Doc 4  Filed 10/10/13  Entered 10/10/13 15:14:26  Main Document
Pg 60 of 64

10-Oct-13
2:50 PM
04BUDGET.XLS

**POST BANKRUPTCY BUDGET 2013-2014**

| | OCT | NOV | DEC | JAN | FEB | Total |
|---|---|---|---|---|---|---|
| Waterproofing | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 100,000 |
| Other capex | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 50,000 |
| | | | | | | |
| **Bankruptcy Expenses** | | | | | | |
| Senior Lender adequate protection payments | | 413,472 | 400,135 | 413,472 | 413,472 | 1,640,552 |
| Other bankruptcy expenses | 24000 | 15000 | 20000 | 21500 | 15000 | 95,500 |
| | | | | | | |
| **NET SHORTFALL** | 237,254 | (303,765) | (445,325) | (348,549) | (260,170) | (1,120,555) |

**Exhibit B**

**(Budget)**

NEWMARK & COMPANY REAL ESTATE, INC.
SUMMARY OPERATING BUDGET:
LIC CROWN LEASEHOLD OWNER, LLC

10-Oct-13
2:50 PM
04BUDGET.XLS

13-13304-mg    Doc 4    Filed 10/10/13    Entered 10/10/13 15:14:26    Main Document
Pg 62 of 64

**POST BANKRUPTCY BUDGET 2013-2014**

| | OCT | NOV | DEC | JAN | FEB | Total |
|---|---|---|---|---|---|---|
| **PROJECTED REVENUES** | | | | | | |
| Base Rent | 819,897 | 819,897 | 755,740 | 750,456 | 754,819 | **3,900,809** |
| Free Rent | 0 | 0 | 0 | (5,824) | (5,824) | **(11,648)** |
| Electric Inclusion | 0 | 0 | 0 | 0 | 0 | **0** |
| Electric Meter | 37,462 | 36,258 | 38,996 | 0 | 0 | **112,716** |
| Real Estate Escalation | 8,273 | 8,273 | 8,273 | 40,555 | 40,344 | **105,718** |
| Operating Escalations | 0 | 0 | 0 | 2,750 | 22,216 | **24,966** |
| Garage Income | 16,815 | 16,815 | 16,815 | 8,366 | 8,366 | **67,177** |
| Water/Sprinkler Income | 1,141 | 15,439 | 1,091 | 2,000 | 2,000 | **21,671** |
| Elevator Service Income | 2,000 | 2,000 | 2,000 | 21,720 | 21,720 | **49,440** |
| Roof/Satellite Income | 1,740 | 1,740 | 1,740 | 1,740 | 1,740 | **8,700** |
| Storage Rent | 0 | 0 | 0 | 0 | 0 | **0** |
| Interest Income | 50 | 50 | 50 | 50 | 50 | **250** |
| Collection Allowance - 4.0% | (35,493) | (36,017) | (32,986) | (33,103) | (34,048) | **(171,648)** |
| **TOTAL REVENUE** | **851,885** | **864,456** | **791,718** | **788,709** | **811,383** | **4,108,151** |

NEWMARK & COMPANY REAL ESTATE, INC.
SUMMARY OPERATING BUDGET:
13-13304-m0 ... Doc 4    Filed 10/10/13    Entered 10/10/13 15:14:26    Main Document
LIC CROWN LEASEHOLD OWNER, LLC
Pg 63 of 64

10-Oct-13
2:50 PM
04BUDGET.XLS

## POST BANKRUPTCY BUDGET 2013-2014

|  | OCT | NOV | DEC | JAN | FEB | Total |
|---|---|---|---|---|---|---|
| **OPERATING EXPENSES** | | | | | | |
| PAYROLL & FRINGES | 75,839 | 75,699 | 89,419 | 77,792 | 77,652 | **396,401** |
| FIRE GUARDS | 78,280 | 25,000 | 25,000 | 25,000 | 25,000 | **178,280** |
| CLEANING | 800 | 800 | 800 | 3,000 | 1,600 | **7,000** |
| ELECTRICITY & GAS | 96,953 | 80,682 | 219,145 | 102,260 | 160,531 | **659,572** |
| FUEL | 0 | 0 | 0 | 0 | 0 | **0** |
| WATER & SEWER | 0 | 40,000 | 0 | 0 | 40,000 | **80,000** |
| SANITATION & EXTERMINATION | 2,181 | 2,181 | 2,181 | 2,181 | 2,181 | **10,905** |
| SECURITY | 1,500 | 0 | 0 | 0 | 200 | **1,700** |
| MISCELLANEOUS OPERATING | 6,800 | 4,400 | 5,672 | 10,800 | 1,000 | **28,672** |
| **SUBTOTAL OPERATING** | 262,353 | 228,762 | 342,218 | 221,033 | 308,164 | **1,362,530** |
| **REPAIRS & MAINTENANCE** | | | | | | |
| REPAIRS - EXCLUDING ELEVATOR | 22,150 | 8,050 | 8,350 | 7,150 | 8,050 | **53,750** |
| ELEVATOR REPAIRS | 7,900 | 7,900 | 7,900 | 7,900 | 7,900 | **39,500** |
| **TOTAL REPAIRS & MAINTENANCE** | 30,050 | 15,950 | 16,250 | 15,050 | 15,950 | **93,250** |
| **ADMINISTRATIVE EXPENSES** | | | | | | |
| MANAGEMENT FEES - AGENT | 20,747 | 21,008 | 19,493 | 16,435 | 16,908 | **94,591** |
| MISC ADMINISTRATIVE EXPENSES | 66,887 | 51,767 | 51,687 | 68,387 | 22,345 | **261,073** |
| **TOTAL ADMINISTRATIVE** | 87,634 | 72,775 | 71,180 | 84,822 | 39,253 | **355,664** |
| **TOTAL OPERATING EXPENSES** | 380,037 | 317,488 | 429,648 | 320,905 | 363,367 | **1,811,444** |
| **INSURANCE** | 34,348 | 34,348 | 34,348 | 34,348 | 34,348 | **171,738** |
| **REAL ESTATE TAXES** | 111,246 | 111,246 | 111,246 | 95,366 | 95,366 | **524,471** |
| **TOTAL RE TAX & INS.** | 145,594 | 145,594 | 145,594 | 129,714 | 129,714 | **696,210** |
| **TOTAL EXPENSES** | 525,631 | 463,082 | 575,242 | 450,619 | 493,080 | **2,507,654** |
| **NET OPERATING INCOME** | 326,254 | 401,374 | 216,476 | 338,090 | 318,302 | **1,600,497** |
| **Capital Expenditures** | | | | | | |
| Fire alarm upgrades - core | | 101,667 | 91,667 | 101,667 | | 295,000 |
| Fire alarm upgrades - tenant | | 25,000 | 25,000 | 25,000 | 25,000 | 100,000 |
| Building engineering surveys | 25,000 | 25,000 | | | | 50,000 |
| Electrical distribution upgrades | | 10,000 | 10,000 | 10,000 | 10,000 | 40,000 |
| Violations removal | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 50,000 |
| Vacant floor prep (demo, white-box) | | 50,000 | 50,000 | 50,000 | 50,000 | 200,000 |
| Leasing/marketing allowance | | 25,000 | 25,000 | 25,000 | 25,000 | 100,000 |

**NEWMARK & COMPANY REAL ESTATE, INC.**
**SUMMARY OPERATING BUDGET:**            13-13304-rdd    Doc 4    Filed 10/10/13    Entered 10/10/13 15:14:26    Main Document
**LIC CROWN LEASEHOLD OWNER, LLC**                                       Pg 64 of 64

10-Oct-13
2:50 PM
04BUDGET.XLS

### POST BANKRUPTCY BUDGET 2013-2014

| | OCT | NOV | DEC | JAN | FEB | Total |
|---|---|---|---|---|---|---|
| Waterproofing | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 100,000 |
| Other capex | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 50,000 |
| | | | | | | |
| **Bankruptcy Expenses** | | | | | | |
| Senior Lender adequate protection payments | | 413,472 | 400,135 | 413,472 | 413,472 | 1,640,552 |
| Other bankruptcy expenses | 24000 | 15000 | 20000 | 21500 | 15000 | 95,500 |
| | | | | | | |
| **NET SHORTFALL** | 237,254 | (303,765) | (445,325) | (348,549) | (260,170) | (1,120,555) |